Albert JIMENEZ, Appellant,

v.

The STATE of Texas, Appellee.

No. 08–89–00194–CR.

Court of Appeals of Texas,
El Paso.

March 21, 1990.

Dennis McGuinness, Lubbock, for appellant.

Ricky B. Smith, Dist. Atty., Lamesa, for appellee.

Before OSBORN, C.J., and FULLER and WOODARD, JJ.

## OPINION

FULLER, Justice.

This is an appeal from a conviction for aggravated sexual assault. The jury assessed punishment at life imprisonment. We reverse and remand.

Point of Error No. One complains of the court's refusal to grant a pretrial motion to suppress the in-court identification of Appellant by the complainant as the tainted product of impermissible pretrial identification procedures. On the night of November 14, 1987, the forty-three-year-old complainant was bathing in her residence in Seminole, Texas. She heard repeated noises at a rear window. She exited the bath

and put on a nightgown to go and investigate. As she stepped out of the bathroom, she was accosted by a male intruder brandishing a knife which she recognized as having been in her kitchen. After a brief struggle, the assailant forced her onto the bed, cut away her nightgown and sexually assaulted her. The entire assault took approximately forty to forty-five minutes. The assailant was not masked, and a light was on in the bedroom. After the attacker left with the knife, the complainant called the police. Officers Sager and Brown arrived within a few minutes, Detective Alvaro Hernandez fifteen minutes later. The complainant was taken to a local doctor who performed a rape examination. Seminal fluid was found on vaginal swabs. Subsequent analysis indicated that the assailant was a non-secretor. Analysis of the Appellant indicated that he too is a non-secretor. The State's expert testified that non-secretors comprise approximately twenty-two percent of the world population, a minority but hardly "a small fraction of the world population" as asserted in the State's brief. No fingerprints were recovered at the scene. Footprints were found and photographed outside the complainant's window, but were never matched to the shoes of any subject by size, shape or tread design. The case against Appellant rested exclusively upon the complainant's in-court identification of Appellant as her assailant.

The complainant provided the first officers with a description of the assailant and indicated that she would be able to identify him if she saw him again. Her first description to Officers Sager and Brown included:

Mexican Male
5′ 6″
165 pounds
25 to 30 years of age
Collar-length black curly or kinky hair
Thin mustache
Small patch of hair in center of chest
Large mouth
Trousers/color unknown
Jumpsuit/color unknown
Dirty gray tennis shoes
Dark blue western shirt

That same night she orally gave a description to Detective Hernandez:

Mexican male
5′ 6″
25 to 30 years old
Black kinky hair
Big lips and large mouth
Sharp nose
Quarter to half-dollar size patch of hair in center of chest
Gray tennis shoes
Dark complexion

Her description was later reduced to a written statement:

5′ 4″
Stocky build
165 to 170 pounds
Collar-length very curly hair
Old gray tennis shoes
Spoke english well
Dark blue western shirt
Small patch of hair on chest
Pants/color unknown
Overalls/color unknown

She gave another description during the subsequent preparation of a composite picture of the assailant:

Mexican male
5′ 2″ to 5′ 4″
Mustache extending beyond lips
Medium build
Fluent in English
Wide nose
Big lips

Finally, in January 1988, she again described the assailant to Texas Ranger Joe Sanders:

5′ 4″ to 5′ 6″
160 to 170 pounds
Stocky build but not fat
Thirty years of age
Very curly hair, over the ears
Wild looking eyes
Blue, long sleeve western shirt
Brown or dirty gray overalls
Thin-line mustache
Small patch of hair on chest
Dirty gray tennis shoes

Additional information provided by the complainant, beyond physical description, included statements attributed to the assailant at the time of the offense. He told the complainant that he knew she was a nurse, that he knew her ex-husband and that he (the assailant) was due to go to jail the next day. Dissatisfied with the course of the investigation, the complainant consulted District Attorney Ricky Smith, who in turn enlisted the assistance of Ranger Sanders in January 1988. In initially being introduced to the case, Sanders was advised that the complainant and her ex-husband's family suspected Ramiro Garza, known as "El Diablo," and who they felt resembled the description of the assailant.

In December 1987, Detective Hernandez obtained four photographs of the Appellant. These were shown to the complainant unaccompanied by photographs of any other subjects—in effect, a one-on-one showup. Hernandez told the complainant that the individual in the photographs was a suspect. Not only did she fail to identify Appellant, she expressly excluded him, saying he was "too young and too pretty."

In January, Ranger Sanders presented the complainant with a photographic array of six subjects. Appellant's full-face photograph, previously used by Detective Hernandez, was included in the third position. A picture of Ramiro Garza (El Diablo) was in the fourth position. In the sixth position was a photograph of one Victor Garcia, who resided three blocks away from the complainant. In the fifth spot was an individual by the name of Juan Arrendondo. Arrendondo was included as the result of a chance encounter with Detective Hernandez. Shortly after the offense, Hernandez and his partner were in a Seminole cafe when Arrendondo entered. According to Hernandez, Arrendondo fit the complainant's description "to a tee." He interviewed Arrendondo for some three hours, during which time the subject repeatedly broke down crying, never denied committing the offense and appeared evasive in his responses.

Viewing the photographic array in January, the complainant did not identify the Appellant, again expressly excluding him as too young and pretty. Nor did she identify Arrendondo. On initial examination by the defense, Ranger Sanders testified that he believed she identified Ramiro Garza as the subject most closely resembling the assailant. On examination by the State, he corrected that statement. In fact, the subject she characterized as most resembling the assailant was her neighbor, Victor Garcia.

The complainant testified that she was on duty at the hospital in mid-May 1988, when the Appellant was brought in for emergency treatment. She testified that she immediately recognized him as her assailant. She did not report the sighting to any law enforcement personnel, but claimed she did tell a co-worker. The co-worker was not called as a witness. During the first week in July, Appellant brought his pregnant wife into the hospital while the complainant was on duty. He repeatedly spoke to the complainant face-to-face. She then contacted Ranger Sanders and made her accusation. Sanders again presented her with a photographic array, and again, despite two alleged recent encounters, she failed to identify Appellant's photograph. The ranger's report of this failed identification was somehow not included in the discovery of materials provided to the defense under pretrial order of the lower court. (See Point of Error No. Nine). Despite the foregoing sequence of events, Appellant was arrested by Ranger Sanders on July 13.

A defendant who asserts error in the admission of an allegedly tainted in-court identification bears a difficult and heavy burden of persuasion at the appellate level. He must demonstrate by clear and convincing evidence that the trial identification was irreparably tainted by impermissibly suggestive pretrial identification procedures. *Herrera v. State*, 682 S.W.2d 313, 318 (Tex.Crim.App.1984). If such irreparable taint existed, it amounted to a denial of due process. *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). The evaluation of the complaint involves a two-step process—first, deter-

mining whether the pretrial procedure was impermissibly suggestive and second, whether there was a resulting substantial likelihood of misidentification. *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). It is this latter danger that is critical and directly implicates the defendant's due process rights. Consequently, even if unnecessarily suggestive procedures were utilized in advance of trial, a subsequent in-court identification may, nonetheless, be permitted if the State demonstrated by clear and convincing evidence at the trial level that the pretrial procedures did not taint the in-court identification and that the testimony was the product of an independent source, namely the observations made at the time of the offense. *Jackson v. State,* 657 S.W.2d 123, 130 (Tex.Crim.App.1983); *Williams v. State,* 477 S.W.2d 885 (Tex. Crim.App.1972). If an independent origin is shown, then it may be concluded that the impermissible pretrial procedure did not result in a substantial likelihood of misidentification. *Id; Herrera,* 682 S.W.2d at 318.

■ In assessing the existence of resulting taint or independent origin for the in-court identification, the courts have identified a variety of factors to be assessed on a case-by-case basis: (1) the witness's prior opportunity to observe the perpetrator, (2) any discrepancy between the witness's earlier descriptions of the perpetrator and the defendant's actual appearance, (3) whether the witness has previously identified some other individual, (4) prior identifications of the accused by the witness, (5) prior failure of the witness to identify the accused, (6) the lapse of time between the offense and the various identifications. *Herrera,* 682 S.W.2d at 318.

■ This case involves an initial photographic "showup" by Detective Hernandez, utilizing four photographs of the Appellant alone. Single subject showups, either physical or photographic, are not impermissible due to inherent suggestiveness, but do require strict scrutiny. *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); *Banks v. State,* 530 S.W.2d 940 (Tex.Crim.App.1975). The same analy-

sis described above is applicable in the case of pretrial physical or photographic showups, as well as multi-subject photographic arrays and physical lineups. *Herrera* (one-subject photographic showup); *Jackson v. State,* 657 S.W.2d 123 (Tex.Crim.App.1983) (physical showup); *Jackson v. State,* 628 S.W.2d 446 (Tex.Crim.App.1982) (physical lineup) *Atkinson v. State,* 511 S.W.2d 293 (Tex.Crim.App.1974).

■ We need not belabor the discussion of the impermissibly suggestive nature of the initial photographic showup by Detective Hernandez; that is conceded by the State. Hernandez provided front and profile views of the Appellant alone. He told the complainant that the photographs were of a suspect. He may even have given the suspect's name. These factors and the State's concession would trigger the six-factor analysis based on the initial showup alone. Compounding the suggestiveness and increasing the likelihood of resulting taint were the multi-subject arrays presented by Ranger Sanders. The multi-subject presentation was a decided improvement, but the procedure was deficient in other respects. In both arrays, Sanders utilized the same full-face photograph of Appellant presented by Hernandez at the outset. In order to avoid a cumulative unconscious or subliminal suggestiveness leading to an eventual "recognition," subsequent arrays including the same subject should employ different photographs of that subject. Ranger Sanders properly refrained from identifying Appellant as a suspect, but apparently could not refrain from indicating that *a* suspect was included in the group. While common sense would dictate that most witnesses at a lineup or photo array expect not to be shown exclusively non-suspects, the better practice for law enforcement personnel would be to avoid all such comments, particularly those indicating a restricted number of suspects in the group. In this case, the various procedures posed a danger of taint not only between the Hernandez showup and the in-court identification, but with the Hernandez display risking taint to the Sanders arrays and by that route, a

cumulative or progressive taint to the trial testimony.

■ In any event, we turn to the second stage of the *Simmons* test and the six-factor analysis described above. Candidly, this is the first case since the acquisition of criminal jurisdiction by this Court in 1981, in which all six factors militate in favor of suppression. With regard to opportunity to observe, it is true that the complainant and her assailant were face-to-face in a lighted room for forty to forty-five minutes. On the other hand, the complainant was not wearing her glasses at the time. As demonstrated at trial, she needed to put on her glasses to even identify three photographs of her own home.

The second factor concerns discrepancies between her initial descriptions and the Appellant's actual appearance. The complainant's first five descriptions of the assailant were very detailed and highly consistent. We discount variations in the description of his build between "medium" and "stocky" as indefinite subjective characterizations, less meaningful then the consistent weight estimates. Similarly, her height estimations were fairly consistent at 5′ 6″, despite one version dropping as low as 5′ 2″ to 5′ 4″. There were, however, three discrepancies which are particularly significant in their cumulative import. The complainant's in-court testimony deviated from her prior description of the assailant's chest hair. Her initial description did not match Appellant's actual appearance. In her earlier descriptions, she stated that the assailant had a small patch of hair (quarter or half-dollar size) in the center of his chest, i.e., the area of the sternum. Appellant was devoid of such growth as depicted in one of the photographs obtained by Detective Hernandez in January 1988. Appellant did have a patch of hair at the base of his throat, and during trial, the complainant testified as to the assailant's body hair, indicating by gesture the base of the throat. Interestingly, subject Arrendondo did have a patch of hair over his sternum.

In addition, the complainant had previously described the assailant as having "wild-looking eyes." At the pretrial suppression hearing, the complainant stated that in her first description to the police she described his eyes as "droopy." To Ranger Sanders, she stated that she had described them as "half-open." These witnesses testified that in fact she had described them as "wild-looking" and not sleepy, droopy or half-open. At trial, her description became:

> [K]ind of droopy, wild. They were strange, like wild, darting—.

None of the photographic exhibits depicting the Appellant reveal wild or darting eyes. Even allowing for individual vagaries in applying such imprecise descriptive terms, common meaning would render the use of "wild" or "darting" incompatible with "droopy." The only reasonable interpretation of the mutation in the complainant's description of the assailant's eyes is as an effort to minimize the discrepancy between her first descriptions and the Appellant's actual appearance.

Finally, we note that while the complainant's initial description of the assailant's build ranged from medium to stocky, she expressly qualified that by saying he was "not fat." Defendant's Exhibit No. Thirteen, depicting Appellant's build would suggest otherwise. Ranger Sanders acknowledged Appellant's pot-belly and confessed to possessing a similar one without considering himself fat. Sander's self-assessment cannot eliminate the discrepancy, given the detail initially provided by the complainant in her descriptions and her pointed exclusion of the assailant being fat. The second factor militates in favor of suppression even more than the first.

The third factor involves whether or not the witness has ever identified some other individual as the perpetrator. This complainant never made an affirmative identification of anyone in the Hernandez display or the Sanders arrays. However, in the six-subject array, she was shown photographs of Appellant (for the second time), of Ramiro Garza (reported to Sanders by her ex-husband's family as a suspect resembling the description), of Juan Arrendondo (described by Detective Hernandez as fitting the description "to a tee") and of

Victor Garcia (a neighbor). She specifically rejected Appellant and pointed out Garcia as the subject most resembling the assailant. The case for suppression grows.

The fourth and fifth factors consider instances of the witness's prior identification or failure to identify the accused. Two months after the assault, the complainant was shown four photographs of the Appellant alone and was told he was a suspect. She expressly excluded him. She was next shown the photographic array of Ranger Sanders and again expressly excluded Appellant, selecting Victor Garcia as a closer match. In mid-May, she allegedly recognized Appellant when he was brought into the emergency room of the hospital. He apparently could not walk, did not see her and was surrounded by hospital personnel. Nonetheless, she did not report this sighting, purportedly out of fear. She claimed that she told a co-worker, but the latter was not called as a witness. In early July, she not only saw Appellant bring his pregnant wife to the hospital, she repeatedly conversed with him face-to-face. She then called Ranger Sanders, who once again presented her with a photographic array. Despite two alleged prior sightings within the preceding six weeks, under far less traumatic circumstances then at the time of the assault, she still could not identify him.

The State's response at trial and on appeal is that Appellant changed his appearance between the time of the offense and the taking of the January photographs used by Hernandez and Sanders, thus excusing or minimizing these prior failures to identify the Appellant. The State cannot have it both ways. The fact is Appellant's appearance at trial, where she did identify him, was consistent with the "changed" appearance in those photographs—namely, an absence of mustache and shorter hair. At trial, she was asked, after identifying Appellant, to evaluate his appearance as it compared to the night of the offense. She responded that he looked just like he did that night, except that his hair was shorter at trial and his mustache was gone. That was apparently no impediment to her in-court identification, but is offered by the State to explain not only her failures to

identify his photograph but her express exclusion of him as the perpetrator.

Finally, there is the sixth factor, evaluating the lapse of time as a framework within which the offense, the failed pretrial identifications and the in-court identification occurred. As previously noted, the complainant failed to identify Appellant's singularly presented photograph (consistent with his trial appearance) within weeks after the offense. Two months later, she expressly excluded him in the first photographic array. She purportedly saw him in the emergency room six and one-half months after the offense, but failed to report it to any law enforcement agent. Six weeks later, at a second, daytime, face-to-face confrontation, she again allegedly recognized him, but six *days* later could not identify him in a six-photograph array. The trial was conducted in April 1989, seventeen months after the alleged offense and eleven months after her last failure to make a photographic identification. The sequence of events and temporal framework cast further doubt upon the elimination of a substantial likelihood of misidentification.

There is an additional circumstance in this case, beyond the traditional six factors discussed above, which discredits the independent origin of the in-court identification. The issue is addressed separately in Point of Error No. Four, but also bears upon the analysis of the first point of error. Immediately prior to the trial before the jury, the court conducted a hearing on the defense motion to suppress the in-court identification. The defense invoked "the rule" pursuant to Tex.R.Crim.Evid. 613. As the trial judge began to instruct the witnesses accordingly, the State interjected a request that the complainant be excused from the rule under Tex.Code Crim.Pro.Ann. art. 56.-02(b) (Vernon Supp.1990). Under that provision, a crime victim is entitled to be "present" at all public court proceedings related to the offense. The court granted the State's request over a defense objection specifically advising the judge of the anticipated harm in that the critical issue in the case was the reliability of the complain-

ant's ultimate in-court identification, the admissibility of which was the sole purpose of the suppression hearing. The State seeks to distinguish *Aguilar v. State*, 739 S.W.2d 357 (Tex.Crim.App.1987) on the basis that there the complainant was not the first witness to testify, while here, the complainant testified prior to hearing the other witnesses. What the State fails to recognize is that while she was the first to testify at the suppression hearing, she then heard the impeaching inconsistencies elicited from the other witnesses and then was called as the first witness before the jury. We have already described the manner in which her description of the assailant's eyes and chest hair gradually changed between the initial five descriptions given, her suppression hearing testimony and her trial testimony. Her presence during the suppression hearing, excused from the rule, further discredits the independent origin of her trial identification. The State's maneuver at the suppression hearing, in effect, added an additional impermissibly suggestive pretrial procedure.

We conclude that in this case, the Appellant has by clear and convincing evidence amply demonstrated the existence of an unreliable in-court identification, irreparably tainted by pretrial identification procedures that created a substantial likelihood of misidentification. The lower court erred in failing to suppress the in-court identification.

Point of Error No. One is sustained.

■ Point of Error No. Two challenges the sufficiency of the evidence, focusing upon the identity element. With the offending in-court identification, this is a direct evidence case, the factors above bearing upon the weight and credibility of the trial identification. The jury was justified, in their discretion, in returning a verdict of guilt, given the evidence before them. The error in this case does not lie with the jury. The error in this case is not their acceptance of the identification over the impeaching evidence. The error was in allowing them to even be exposed to the identification testimony. We cannot consider the sufficiency of the evidence excluding the inadmissible in-court identification. *Bass v. State*, 732 S.W.2d 632 (Tex.Crim.App.1987).

Point of Error No. Two is overruled.

Point of Error No. Three presents a complaint under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), that the State systematically utilized its peremptory challenges to exclude Appellant's fellow Hispanics from service on the petit jury. Given our disposition of the first point of error, we do not reach the merits of this issue. We do, however, extend to the prosecutor our grave concern as to the adequacy of his rebuttal of the Appellant's prima facie case of discriminatory use of peremptory challenges. Of particular concern is the discrepancy reflected in his avowed reliance upon certain selection factors present in the challenged Hispanic veniremen which were also present in an even greater number of unchallenged non-Hispanic panel members.

■ In Point of Error No. Four, Appellant complains of the exemption of the complaining witness from the rule during the pretrial suppression hearing on the basis of Article 56.02(b). We concur with the State's suggestion of the symbolic *and* substantive importance of the Crime Victims' Bill of Rights. We agree that its philosophical direction is essential to restoring and maintaining the public's faith in the criminal justice system. The introductory phrase of Article 56.02(a), however, states that the enumerated victims' rights are to be effectuated *"within* the criminal justice system" [emphasis ours], not by superseding or overriding it. Faith in the justice system will not be enhanced by applying the provisions of Article 56.02 in such a way as to destroy the integrity of the truth-finding evidentiary process. The rule expressed in Article 36.03 is not the creature of a society overly protective of defendant's rights. The rule is neutral, preserving the integrity of the fact-finding process as applied to evidence proffered from both sides of the criminal docket. Article 56.-02(b) does not preempt Article 36.03; the two must be read in harmony. The right to "presence" assured by Article 56.02(b) was created to preclude dispositions of criminal

cases in a manner which does not adequately consider the impact of crime upon the individual victim—dispositions theoretically carried out in open court but in reality unattended by even the general public, much less the specific victim. The right to "presence" intended to counteract that systemic insensitivity does not necessitate the physical presence of the victim/witness in the courtroom during other testimony (and certain legal argument) in such a manner that subsequent evidence may be tainted to the detriment of the jury's deliberation and verdict. In this case, the critical, indeed the only contested issue was the reliability and admissibility of the complainant's ultimate in-court identification. The sole purpose of the suppression hearing at which she was allowed to remain in attendance was to evaluate the legal and factual propriety of the antecedents to her ultimate identification. If ever there were a case in which the *literal* language of Article 56.-02(b) should yield to the rule, this is such a case. It was a clear abuse of discretion to overrule the defense objection in this regard and exempt the complainant from the rule.

Point of Error No. Four is sustained.

■ Point of Error No. Five presents an improperly couched challenge to the sufficiency of the State's evidence to negate the guilt of Juan Arrendondo beyond a reasonable doubt. The point would novelly present some theoretical merit had the case against Appellant been circumstantial in nature. It was not.

Point of Error No. Five is overruled.

■ In Point of Error No. Six, we reach no conclusion on the merits—in part because of a failure to preserve an essential portion of the asserted error in the trial court and, in part, because of the reversal and remand already necessitated by our disposition of other points. We do offer the following summary and comment (admittedly dicta) in light of the prospect of retrial. Faced with the complainant's repeated failures to identify the Appellant prior to trial, the State sought to demonstrate to the jury that he had the capacity and, in fact, had changed his appearance

over the years, particularly with regard to the length of his hair and the presence of facial hair. W.M. Butler was called as a witness and provided a photograph of Appellant taken in September 1981, over six years before this alleged offense. Butler was not questioned as to his relationship with Appellant, but during voir dire he was described as a Yoakum County probation officer. The State also called Porfirio De-Leon who provided a booking photograph of Appellant taken in December 1986, eleven months before the indicted offense. Again, DeLeon was not questioned as to his relationship with the Appellant. In fact, he was a deputy sheriff from Lubbock, Texas. Lloyd Glass, a local Gaines County probation officer, was called to provide two additional photographs of the Appellant, one from February 1982 and one from November 1985. Gaines County Sheriff Jon Key also provided photographs of Appellant taken at the time of his July arrest on the indicted offense. Key's exhibits and testimony are (appropriately) not challenged on appeal. The prejudicial effect of the challenged photographs and accompanying testimony clearly outweighed the probative value. As support for the general proposition that Appellant had the capacity to alter his hair length and facial hair, they were totally unnecessary. As support for his specific appearance under such alterations and that contribution to the jury's assessment of the complainant's pretrial failures to identify him, their probative value was negligible. The unchallenged photographs from January and July 1988 were more probative both in temporal relationship and physical appearance. The other photographs were too remote in time. Two of them reflected neither his appearance at the time of trial, nor his alleged appearance at the time of the offense. In the oldest photograph, glasses obscure his eyes, the picture is very blurred, and his hair is not merely over his ears, it totally obscures them. In State's Exhibit 12, a close relative might understandably fail to recognize him. He is wearing a hard-hat, large sunglasses, sideburns, a goatee and a heavy ranch coat. In the event of retrial, a

reconsideration of the use of these witnesses and exhibits would be in order.

Points of Error Nos. Seven and Nine relate to alleged failure of the State to disclose exculpatory material and failure to comply with a pretrial discovery order (that portion of Ranger Sanders' report relating the second, July failure on the part of the complainant to identify the Appellant in the photographic array). These are unlikely to pose injury upon retrial and hence, are not reached.

 Point of Error No. Eight asserts prosecutorial misconduct in the form of argument outside the record, injecting new "facts" before the jury. The significance of Juan Arrendondo as a suspect has been detailed above. Of course, the defense commented on the investigation of Arrendondo, relying upon the record evidence in final argument. The prosecutor responded:

And he [defense counsel] said I didn't bring Juan Arrendondo here. He knows full well we had him sitting out there in the hallway. The reason he didn't bring him in here is because he had a scar on his face that you could see.

In fact, during the defense presentation of evidence, counsel called Sheriff Key and elicited the fact that a defense subpoena for Arrendondo had not been served. The prosecutor's reference to Arrendondo's scar was within the record, being found in the testimony of Detective Hernandez. Nonetheless, the asserted presence of Arrendondo in the hallway was outside the record and the asserted motivation of the defense not to call him was not a reasonable inference from the evidence before the jury. Despite the scar, Hernandez testified that Arrendondo fit the assailant's description "to a tee", Appellant did not and Hernandez was convinced that Arrendondo was the perpetrator. The defense issued the subpoena for Arrendondo and questioned the sheriff in that regard. The prosecutor did not elicit Arrendondo's purported presence through Key or any other witness.

The defense objection to the argument was sustained and a curative instruction given. While that is generally considered sufficient to remove any taint, in this case, given the misidentification issues discussed above, we consider this improper argument not susceptible to cure. *Johnson v. State*, 583 S.W.2d 399 (Tex.Crim.App.1979); *Parr v. State*, 575 S.W.2d 522 (Tex.Crim.App. 1978).

Point of Error No. Eight is sustained.

The judgment is hereby reversed and the cause remanded for new trial.