**Reversed and Remanded and Opinion filed November 5, 2019.**



In The

# 𝕱𝖔𝖚𝖗𝖙𝖊𝖊𝖓𝖙𝖍 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘

## NO. 14-18-00448-CR

**ADRIENNE DERAY AUGUST, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 506th Judicial District Court**
**Waller County, Texas**
**Trial Court Cause No. 17-04-16006**

## O P I N I O N

Appellant Adrienne Deray August was convicted of burglary of a habitation and sentenced to 20 years' confinement. In three issues, Appellant asserts (1) the trial court erred by denying his motion to suppress; (2) the evidence is legally insufficient to support his conviction; and (3) the trial court erred by denying his motion for new trial. For the reasons below, we reverse Appellant's conviction and remand the case for a new trial.

## BACKGROUND

Appellant was arrested and charged with burglary of a Brookshire apartment. Before he proceeded to trial, Appellant filed a motion to suppress eyewitness Daniel Glover's identification of Appellant as one of the suspects involved in the burglary. Glover observed the burglary during the early-morning hours of January 25, 2017; he said he heard glass breaking and watched three individuals carrying plastic bags and other objects from a downstairs apartment to a car parked out front. Glover later was presented with Appellant and two other men at a show-up identification. After a hearing, the trial court denied Appellant's motion to suppress.

Appellant's three-day trial was held in May 2018. After the close of evidence, the jury found Appellant guilty. Appellant timely appealed.

## ANALYSIS

Appellant asserts three issues on appeal:

1. The trial court abused its discretion by denying Appellant's motion to suppress Glover's out-of-court identification.
2. The evidence is legally insufficient to support Appellant's conviction for burglary of a habitation.
3. The trial court abused its discretion by denying Appellant's motion for new trial.

With respect to Appellant's second issue, we conclude his conviction is supported by legally sufficient evidence. Turning to Appellant's first issue, we conclude the trial court abused its discretion by denying Appellant's motion to suppress. Based on our disposition of this issue, we do not address Appellant's third challenge with respect to his motion for new trial.

2

## I. Legally Sufficient Evidence Supports Appellant's Conviction for Burglary of a Habitation.

We begin by addressing Appellant's second issue which, if sustained, would be dispositive of his appeal. *See, e.g., Wyatt v. State*, 367 S.W.3d 337, 340 (Tex. App.—Houston [14th Dist.] 2012, pet. dism'd). Appellant argues the evidence is legally insufficient to support his conviction for burglary of a habitation because "the only evidence linking appellant to this offense is the testimony of law enforcement that the witness identified appellant on the scene."

### A. Standard of Review and Governing Law

For a legal-sufficiency challenge, we view the evidence adduced at trial in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Williams v. State*, 937 S.W.2d 479, 482-483 (Tex. Crim. App. 1996) (citing *Jackson v. Virginia*, 443 U.S. 307 (1979)). A person commits burglary of a habitation if, without the consent of the owner, the person enters the habitation and commits or attempts to commit theft. Tex. Penal Code Ann. § 30.02(a)(3) (Vernon 2019). The Penal Code defines "enter" as intruding with any part of the body or any physical object connected with the body. *Id*. at (b). A person commits theft if the person appropriates property without the owner's effective consent with intent to deprive the owner of the property. *Id*. § 31.03(a), (b)(1) (Vernon 2019).

### B. Evidence at Trial

Four witnesses testified at Appellant's trial: eyewitness Glover, Brookshire police officers Sheraz Khan and Robert Ruiz, and Lisa Woods.

Glover testified regarding the burglary and his subsequent identification of Appellant as one of the individuals involved in the incident. Glover said he was awake in his apartment around 2:00 a.m. when he heard glass breaking; he looked

3

out his dining room window and saw three individuals carrying bags or objects from the downstairs apartment to a white car parked out front. Describing the parking lot's lighting as "not very good," Glover said he could see only the individuals' silhouettes and could not make out their facial features. Glover also described some of the individuals' clothing.

Glover testified that he watched the individuals for 30-35 minutes. When they were closest to his dining room window, Glover said they were about three-to-five feet away; at their vehicle, they were about 10-15 feet from Glover's window. On cross-examination, Glover stated he wears glasses to see distance but was not wearing his glasses the night of the burglary. Glover said his lack of glasses did not impact his perception of the incident.

Glover's wife called the police while he continued to watch the burglars from his window. Glover testified that the police responded to his apartment complex about five minutes after the burglars left. Three men, including Appellant, were transported to Glover's complex for a show-up identification. Glover said he was not able to identify the individuals he had seen by their facial features or looks, but recognized their heights, builds, and some of their clothing. On cross-examination, Glover acknowledged that, during the motion-to-suppress hearing held the previous month, he was not able to "formally identify" Appellant as one of the individuals who committed the burglary. Prior to trial, the State filed a "Formal Notice of All Known Potential *Brady* Evidence" stating, at that time, Glover was unable to identify Appellant in open court.

Officer Khan began his testimony by describing a traffic stop he made around 2:00 a.m. approximately one block from Glover's apartment complex. Officer Khan pulled over a white car for making an illegal U-turn; three men were riding in the car, including Appellant. Officer Khan testified that the car's

4

occupants said they were out looking at horses in the area; Officer Khan said the occupants' stories were "kind of . . . out of place" and differed from one to another. Officer Khan searched the vehicle and found in the trunk a crowbar, a bolt cutter, black gloves, a "do-rag" which "is basically a hair cap," and some other clothing items. Officer Khan did not find any property in the car that later was reported missing from the burglarized apartment.

Officer Khan said he became aware of the burglary at Glover's complex about 15 minutes after initiating the traffic stop. This testimony is directly contradicted by the video evidence admitted at the motion-to-suppress hearing but not admitted at trial. The video evidence shows that, between the time Officer Khan made the stop and the time he became aware of the burglary, approximately 40 minutes had elapsed. Officer Khan testified that the three men from the traffic stop were transported to Glover's complex and Glover "was able to positively identify" the men as the individuals involved in the burglary. This testimony is directly contradicted by the video evidence admitted at the motion-to-suppress hearing but not admitted at trial. Specifically, when asked "How sure are you?" about the individual in the orange t-shirt, Glover responds, "Not that sure." When asked next about the individual in the black t-shirt, Glover says, "I don't know if that's one for sure." He then positively identified the driver (the third individual) by the pants he was wearing. Appellant was the individual in the black t-shirt.

Officer Ruiz also responded to the traffic stop and testified that the men in the white car were "very nervous." Towards the end of the traffic stop, Officer Ruiz received the dispatch about the burglary and drove to Glover's apartment complex. Investigating the burglarized apartment, Officer Ruiz said the living room and bedroom had been "ransacked." Officer Ruiz was present during the show-up identification and testified that Glover positively identified Appellant and

5

the other two men as the individuals involved in the burglary. This testimony is directly contradicted by the video evidence admitted at the motion-to-suppress hearing but not admitted at trial.

Lisa Woods, the tenant in the burglarized apartment, was the last witness to testify at Appellant's trial. Stating that she did not give anyone permission to enter her apartment, Woods stated the burglars stole TVs, jewelry, purses, a tablet, and games.

### C. Application

Appellant's burglary-of-a-habitation conviction is supported by legally sufficient evidence at the trial. Without any evidence to the contrary, the jury reasonably could have believed the testimony of the officers regarding Glover's positive identification of Appellant. Contrary to Appellant's position, a police officer may testify about another witness's out-of-court identification of the alleged wrongdoer. *See Smith v. State*, 520 S.W.2d 383, 385 (Tex. Crim. App. 1975) ("No expertise is required to testify that a 'positive identification' was made."); *see also, e.g., Rodriguez v. State*, 975 S.W.2d 667, 682 (Tex. App.—Texarkana 1998, pet. ref'd); and *Smith v. State*, 830 S.W.2d 328, 329 (Tex. App.—Houston [14th Dist.] 1992, no pet.). Even though this testimony is directly contradicted by video evidence admitted in the motion-to-suppress hearing, the applicable video evidence was not admitted (or offered) into evidence in the trial on the merits. Therefore, the jury did not have the opportunity to consider it.

Having found the evidence presented to the jury sufficient to support the conviction, we overrule Appellant's second issue.

## II. The Trial Court Erred by Denying the Motion to Suppress.

We turn now to Appellant's first issue, in which he asserts the trial court

erred in denying his motion to suppress because (1) the show-up identification was unnecessarily suggestive, and (2) Glover's identification was unreliable.

### A.    Standard of Review and Governing Law

We review a trial court's ruling on a motion to suppress for an abuse of discretion, viewing the evidence in the light most favorable to the trial court's ruling. *Shepherd v. State*, 273 S.W.3d 681, 684 (Tex. Crim. App. 2008); *Mendoza v. State*, 443 S.W.3d 360, 362 (Tex. App.—Houston [14th Dist.] 2014, no pet.). The trial court is the sole judge of the witnesses' credibility and the weight to be given their testimony, and we afford almost total deference to its express or implied determinations of historical fact unless those determinations are not supported by the record. *State v. Kerwick*, 393 S.W.3d 270, 273 (Tex. Crim. App. 2013); *Scott v. State*, 572 S.W.3d 755, 760 (Tex. App.—Houston [14th Dist.] 2019, no pet.). We sustain the trial court's ruling if it is reasonably supported by the record and correct under any theory of law applicable to the case. *Laney v. State*, 117 S.W.3d 854, 857 (Tex. Crim. App. 2003).

A pretrial identification procedure may be so suggestive and conducive to mistaken identification that subsequent use of that identification at trial constitutes a denial of due process. *Barley v. State*, 906 S.W.2d 27, 32-33 (Tex. Crim. App. 1995). We review *de novo* the question of whether a pretrial identification procedure amounted to a denial of due process. *Mendoza*, 443 S.W.3d at 363. To satisfy this burden, Appellant must show by clear and convincing evidence that (1) the pretrial identification procedure was impermissibly suggestive, and (2) the pretrial identification procedure gave rise to a substantial likelihood of irreparable misidentification. *Tutson v. State*, 530 S.W.3d 322, 326 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

"On the scene" or "show up" identifications do not necessarily violate a

defendant's right to due process but tend to be suggestive to some degree. *Id.* at 327. We consider the totality of the circumstances in determining whether a show-up identification was impermissibly suggestive. *Mendoza*, 443 S.W.3d at 364.

To determine whether an impermissibly suggestive identification procedure gave rise to a substantial likelihood of irreparable misidentification, we consider five nonexclusive factors: (1) the witness's opportunity to view the suspect at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the suspect; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Tutson*, 530 S.W.3d at 327. Because these factors are nonexclusive, we may consider any other appropriate factor. *See Loserth v. State*, 985 S.W.2d 536, 543 (Tex. App.—San Antonio 1998, pet. ref'd); *Jimenez v. State*, 787 S.W.2d 516, 522-23 (Tex. App.—El Paso 1990, no pet.). These factors are weighed deferentially in a light favorable to the trial court's ruling. *Loserth*, 985 S.W.2d at 543; *Jimenez*, 787 S.W.2d at 522-23. "If the totality of the circumstances indicates that a substantial likelihood of irreparable misidentification exists, admission of the identification amounts to a denial of due process." *Adams v. State*, 397 S.W.3d 760, 764 (Tex. App.—Houston [14th Dist.] 2013, no pet.). If the pretrial procedure is found to be impermissibly suggestive, identification testimony would nevertheless be admissible if the totality of the circumstances shows no substantial likelihood of misidentification. *Ibarra v. State*, 11 S.W.3d 189, 195 (Tex. Crim. App. 1999). Reliability is the critical question. *Id.*

### B. Evidence and Application

The trial court ruled on the motion to suppress after the suppression hearing but before Appellant's trial began. The trial court did not exercise its discretionary

authority to reopen the suppression hearing, and the parties did not consensually relitigate the motion to suppress during trial. *See Black v. State*, 362 S.W.3d 626, 635-36 (Tex. Crim. App. 2012). Therefore, in reviewing the trial court's denial of appellant's motion to suppress, the only evidence we consider is the evidence presented at the pretrial suppression hearing. *See id*. In our analysis of this issue, we are to examine two factors: the suggestiveness of the show-up identification and the reliability of Glover's identification. *See Tutson*, 530 S.W.3d at 326.

### 1. The Show-Up Identification Was Impermissibly Suggestive.

Our analysis of this prong begins with a summary of relevant testimony from Glover and Officers Khan and Ruiz.

According to Officer Ruiz, Appellant and the other two men detained in the traffic stop were transported to Glover's apartment complex and presented to Glover "one by one" as they were pulled out of a patrol vehicle. Officer Ruiz testified that the men were illuminated by spotlights and flashlights. Officer Ruiz did not recall whether the men were handcuffed during the show-up identification.

Similarly, Officer Khan testified the three men were pulled out of a patrol vehicle and illuminated with spotlights during the identification. Officer Khan stated the men were handcuffed and there were four officers at the scene.

Glover testified he was unable to see the burglars' facial features during the burglary but could make out their silhouettes and describe some of the clothing they were wearing. Glover recalled that one of the individuals was wearing dark blue or black pants with a white fadeout. Glover stated the individuals were in a white car.

Glover also said that, before the show-up identification took place, the officers told him "they were bringing three individuals over to see if [he] could

9

identify them." Glover testified that he knew the men had been in a traffic stop. Glover stated the men were handcuffed when they were shown to him, but he did not recall seeing a patrol car. Glover said there were three or four officers at the scene.

Officer Ruiz's patrol car's dashboard camera footage from the night of the burglary was admitted into evidence without objection during the suppression hearing. Footage from Officer Khan's dashboard and body cameras and an audio recording of an interview with Glover also were admitted into evidence at the suppression hearing. Although this footage and audio recording were in evidence, they were not discussed or played during the suppression hearing. The footage and recording were not offered into evidence during Appellant's trial.

Officer Ruiz's dashboard camera footage shows Officer Ruiz arriving at the scene of Officer Khan's traffic stop before he proceeds to Glover's apartment complex. Officer Ruiz arrives at the complex and exits his patrol car; outside of the camera's frame, Officer Ruiz can be heard talking to another law enforcement officer and Glover. Discussing Officer Khan's traffic stop, Officer Ruiz describes the three men that were detained, the clothing they were wearing, and the white car they were in. Officer Ruiz then asks Glover if he can make an identification of the individuals involved in the burglary, and Glover acknowledges that he could identify them by their silhouettes.

Considering the totality of the circumstances and the evidence presented at the suppression hearing, we conclude the show-up identification was impermissibly suggestive.

A show-up identification is not impermissibly suggestive merely because, during the identification, the suspects were handcuffed, illuminated by spotlights, and surrounded by police officers. *See, e.g., Nunez-Marquez v. State*, 501 S.W.3d

226, 236 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd) (show-up identification was not impermissibly suggestive where the appellant was handcuffed to a fence and illuminated with spotlights from two patrol cars); *Mendoza*, 443 S.W.3d at 363-64 (show-up identification was not impermissibly suggestive where five suspects found near scene of robbery were presented one-by-one to the complainants). But as discussed in *Nunez-Marquez* and *Mendoza*, these identifications also employed certain safeguards to mitigate the procedures' suggestiveness. *Nunez-Marquez*, 501 S.W.3d at 235-37 (the complainants were kept separate before and after the identifications and were informed the suspect "may or may not" have been involved in the crime); *Mendoza*, 443 S.W.3d at 364 (the complainants were kept separate en route to the show-up identification and were told the suspects "may or may not have been the persons who committed the crime").

In contrast here, the evidence shows the specific interactions between Officer Ruiz and Glover prior to the show-up identification rendered the procedure impermissibly suggestive. Glover testified that, during the burglary, he could not make out the individuals' facial features but was able to identify their silhouettes, some of their clothing, and that they were in a white car. Because Officer Khan and Ruiz had allowed two of the men to walk away from the traffic stop approximately five minutes before, only the driver of the white car was in custody at the time Officer Ruiz was questioning the witness. Immediately after Glover told Officer Ruiz that the individuals were three black men in a white car, Officer Ruiz can be heard on his dashboard video requesting that another patrol car find the two men they just released and transport them to the scene for identification. While on his radio, and in Glover's presence, he identified some of the men's clothing (black shirt, orange shirt, black pants) and the white car they were in.

11

These statements directly supplied the components central to Glover's description of the individuals he had watched during the burglary and their car and therefore contaminated the reliability of his recollection. Additionally, while he is questioning Glover and a woman on the scene before Appellant arrived for the show-up identification, Officer Ruiz tells them that patrol officers are bringing back the other people (besides the arrested driver) so that "somehow we can get them identified". The woman then asks whether anything was found in their car, and Officer Ruiz responds that they did have some items but that they didn't know if what they had was from the burglarized apartment or was from their own homes. Moreover, Glover testified that he knew prior to the show-up identification that Appellant and the other two men were detained as part of a traffic stop. Because Glover saw the individuals drive away from the complex after the burglary, this knowledge regarding the circumstances of the men's apprehension further tainted the reliability of his identification. *See, e.g., Tutson*, 530 S.W.3d at 326-27 (identification procedure was "more suggestive" where witness aware of circumstances surrounding suspect's apprehension).

Considering the totality of the circumstances in a light favorable to the trial court's ruling, we conclude the evidence at the suppression hearing proved that the show-up identification procedure was impermissibly suggestive. Appellant met his burden with respect to the first prong of the applicable test.

### 2. The Show-Up Identification Gave Rise to a Substantial Likelihood of Irreparable Misidentification.

We turn now to the second prong, which examines whether the impermissibly suggestive show-up identification procedure gave rise to a substantial likelihood of irreparable misidentification. *See id*. at 326. As with the discussion above, our analysis of this prong focuses on evidence that was admitted

only at Appellant's motion to suppress hearing, namely, dashboard camera footage, an audio recording of Glover's interview, and the Brookshire Police Department Incident Report completed with respect to the burglary. Based on this evidence, we conclude the record does not support the trial court's implied finding that Appellant did not meet his burden of proving that the show-up identification procedure gave rise to a substantial likelihood of irreparable misidentification.

Glover met with a Brookshire police department investigator the morning of the burglary and discussed his recollection of the incident. On the audio recording of this interview, Glover states he and his wife were falling asleep when he heard glass breaking. Glover looked out his dining room window and saw two individuals removing black trash bags and other objects from a downstairs apartment to a white car parked out front. Glover said that, approximately five minutes after hearing the glass break, he asked his wife to call the police using his cell phone. Checking his cell phone call log, Glover said the call to police was placed at 2:26 a.m. Glover estimated he watched the suspects for a total of 20-25 minutes before they drove away form the complex.

At the hearing on the motion to suppress, Glover testified that he continued to watch the suspects for 10-15 minutes after he called the police and that within five minutes of them leaving, the police arrived.

The Brookshire Police Department Incident Report states the call reporting the burglary was received at 2:27 a.m.; the call was dispatched at 2:29 a.m.; and a responding officer arrived at 2:42 a.m.

Glover's statement and the incident report both indicate the call to police was made at approximately 2:27 a.m. This timing is consistent with the footage from Officer Khan's patrol car dashboard camera: at time stamp "02:28:05," a dispatch comes over Officer Khan's car radio stating a burglary had occurred at

13

Glover's apartment complex, specifically at "Apartment 104-A". But Officer Khan initiated the traffic stop on the white vehicle with Appellant and the other two men at time stamp "02:12:47" — approximately 15 minutes before the call to police reporting the burglary. The traffic stop was ongoing when the dispatch was received. Therefore, beginning at least 15 minutes before the burglary was reported, Appellant and the other two men riding in the white car were detained by Officer Khan. This elapsed timeline is further corroborated by Officer Khan's body camera footage, because even though its time stamp is set 40 minutes ahead of the two dashcam videos, the body cam footage shows exactly the same sequence of events from almost the beginning of the traffic stop to the end. The body cam footage starts at time stamp "02:58:12" after Officer Khan has already walked up to the vehicle and asked for the driver's license and insurance information but before he asks for the passenger's identification. At time stamp "02:59:16" Officer Khan speaks into his radio (this is consistent with the recording from his dashboard camera video which records the same event at time stamp "02:17:06", almost exactly 5 minutes after his dashboard camera first activated.") At time stamp "03:09:59" on the body camera footage, the same dispatch call can be heard over Officer Khan's police radio reporting the break in at "Apartment 104-A". No matter what time the trial judge could have believed was the correct one, all the video evidence in the record shows the same thing: that when the burglary call for Apartment 104-A was issued through dispatch, Appellant already had been detained on the side of the road by Officer Khan for at least fifteen minutes. Further, toward the end of the first dashcam video (at the end of the traffic stop, when nearly twenty-five minutes had elapsed since the dispatch call came across the police radio), Officer Khan and Officer Ruiz allow Appellant and the other passenger to walk away and they are seen on the video walking in the opposite direction of the complex. The video then shows, in an unbroken timeline, Officer

Ruiz driving around the corner to the location of the burglary.

Even when viewed in the light most favorable to the trial court's implied finding, this evidence shows Appellant already was being detained when the burglary in process was reported and could not have been one of the individuals involved in the burglary. Satisfying the second prong of the applicable test, Appellant has met his burden to show by clear and convincing evidence that the pretrial identification procedure gave rise to a substantial likelihood of irreparable misidentification. *See Loserth*, 985 S.W.2d at 544-48; *Jimenez*, 787 S.W.2d at 521-23.

We sustain Appellant's first issue. Because of our disposition of this issue, we do not reach Appellant's third issue addressing the trial court's denial of his motion for new trial.

## CONCLUSION

Having held the trial court erred in denying Appellant's motion to suppress, we reverse the trial court's judgment and remand this cause to the trial court for a new trial.


/s/    Meagan Hassan
        Justice


Publish – Tex. R. App. P. 47.2(b)
Panel consists of Chief Justice Frost and Justices Wise and Hassan.

15