Kelly KNOTT, Appellant,

v.

The STATE of Texas, Appellee.

No. 08–14–00235–CR

Court of Appeals of Texas,
El Paso.

February 10, 2017

Discretionary Review Refused
May 3, 2017

Jaime E. Esparza, John L. Davis, The State of Texas.

Jaime E. Gandara, Janet Burnett, for Kelly Knott.

Before McClure, C.J., Rodriguez, and Hughes, JJ. Hughes, J., not participating

## OPINION

ANN CRAWFORD McCLURE, Chief Justice

Appellant Kelly Knott was convicted by a jury of robbery, evading arrest, and escape while under arrest. After pleading true to the alleged enhancements, Knott was sentenced to prison terms of 80, 20, and 35 years respectively, with the sentences to run concurrently. Appellant contends on appeal that the trial court erred in denying his motion to suppress the victim's identification testimony, the trial court erred in refusing to instruct the jury on the lesser-included offenses of assault and theft, and the trial court committed fundamental error when it made an unobjected-to comment to the jury panel during voir dire regarding Appellant's constitutional right against self-incrimination. We affirm.

## FACTUAL BACKGROUND

### The Robbery Offense

Around 9:45 p.m. on May 25, 2013, Jackson Mainwaring, a 22–year-old college student, was walking out of a local coffee shop in downtown El Paso, when he noticed two men standing outside, who said "something in [his] direction." Mainwaring ignored the two men and began walking down the street toward his car. The two men followed, and after approaching him from behind, asked him for directions to a local bar. Mainwaring informed the men that he was not familiar with the downtown area, and that he did not know the location of the bar. Mainwaring proceeded to his car, attempting to ignore the two men as they continued to follow him and ask for directions.

One of the men, whom Mainwaring later identified as Appellant, punched Mainwaring in the face with his fist, and then demanded his wallet. Mainwaring handed his wallet to Appellant, who then ran off. Before he had a chance to call 911, Mainwaring saw a police car pull up at a nearby intersection, and he flagged it down. In an obviously traumatized state, Mainwaring reported to the officer driving the car, El Paso Police Officer Ricardo Villagran, that he had been "mugged" and that the perpetrator had punched him in the face and demanded his wallet.

Mainwaring informed Officer Villagran that his assailant was a tattooed Hispanic male of average height, with short hair, who was wearing jeans and a "whitish" tank top. Officer Villagran then drove Mainwaring to his car, and advised him to drive to the nearby downtown police station, while Officer Villagran searched the area for the suspects.

### The Evading Arrest Offense

While searching the area, Officer Villagran made a radio broadcast, providing a description of the suspects as given to him by Mainwaring. Another El Paso Police Officer, Officer Erik Morales, heard the broadcast and recalled that moments earlier he had seen two men walking within a few blocks of where the offense had occurred. Officer Morales located the two men and saw that one of them was wearing a white tank top and generally

matched the description of the suspects. When Officer Morales approached the two men in his marked police car, they began running. Officer Morales activated his overhead lights, and after losing sight of one of the suspects, followed the suspect wearing the white tank top, whom he later identified as Appellant, yelling "stop, police" through the open window of his patrol car. Officer Morales caught up with Appellant three or four times during the chase, but each time Appellant ran a different direction, causing Officer Morales to have to turn and reverse directions. During the chase, Officer Morales broadcast on his radio that he had located the suspects and needed assistance.

Another officer, Officer Anthony Loera, who had also earlier heard Officer Villagran's description of the robbery suspects, responded to Officer Morales's call for assistance. Officer Loera was also in a marked police car and activated his overhead lights as he approached the area where Officer Morales had located the suspects. Almost immediately, Officer Loera saw an individual matching the description of one of the suspects, whom he later identified as Appellant, pass directly behind his vehicle. Officers Loera and Morales both exited their vehicles and gave chase on foot. Shortly thereafter, Officer Villagran pulled up in his patrol car and joined in the foot chase. All three officers were in full uniform, and were yelling "stop, police," as they pursued Appellant.

One of the officers eventually caught and tackled Appellant, and following a brief struggle, the officers were able to subdue Appellant and take him to the ground. As Appellant was being tackled, all three officers observed various documents fall from his person. These documents included a driver's license and various identification cards with Mainwaring's name on them. Shortly thereafter, Officer Morales located a wallet in a nearby trash can.

Officer Villagran took the identification cards and the wallet to the police station, where Mainwaring identified all of the items as belonging to him. Officer Villagran thereafter drove Mainwaring to the location where Appellant was being detained, and Mainwaring identified Appellant as the perpetrator of the robbery.[1]

### The Escape from Arrest

Appellant was placed under arrest and transported in handcuffs to the El Paso police station by Officer Loera. After arriving at the station, Officer Loera took Appellant by the arm as he exited the patrol car. While continuing to hold Appellant's arm in an "escort position," Officer Loera looked in the backseat of the patrol car to ensure that no contraband, such as weapons or narcotics, had been left behind. Despite being in handcuffs, Appellant pulled out of Officer Loera's grasp and "took off running on foot." After running less than two blocks, Officer Loera was able to catch Appellant and tackle him from behind. At the police station, an arrest photograph was taken of Appellant, showing that he was wearing a white tank top and jeans, and was heavily tattooed, as described by Mainwaring.

### The 911 Call Center Evidence

Shortly after the offense occurred, the El Paso Police Department was notified

---

1. It was unclear whether Mainwaring was shown his missing property before or after the showup was conducted. At trial, Mainwaring testified that he was not shown the items until after the showup occurred. However, Officer Villagran testified both during a pretrial suppression hearing and at trial that Mainwaring was shown the items before the showup occurred.

that a 911 call center operator, Carlos Jaime Deanda, who worked at the 911 communications building in downtown El Paso, had been walking on the sidewalk outside the building between 9:30 p.m. and 10 p.m. and had observed what he described as an "altercation" involving three men. Deanda had also observed two of the men running from the scene, but was only able to view the men from behind and therefore did not get a "good look" at them. Deanda immediately notified his supervisors of the event, who alerted the police.

When the police arrived to interview him approximately an hour later, Deanda was able to provide a general description of the clothing worn by the two men, indicating that one of the men wore a white tank top, while the other wore a gray one. Deanda was also taken to the location where Appellant was being detained, but was unable to make a positive identification, and did not identify Appellant at trial.

Deanda also informed the officers that the 911 call center had a video camera mounted outside the building, and he provided them with a copy of the footage taken from the camera during the relevant time period. After Deanda verified its authenticity, the video recording was played for the jury, without objection from defense counsel. The recording did not capture the actual offense, but only the aftermath. It showed two men running down the sidewalk. One of the men appeared to be wearing a dark tank top and jeans, and the other appeared to be wearing a white tank top and jeans. At trial, the State also played the recording for Mainwaring, who identified the individual in the video wearing the white tank top as the individual who had assaulted him and demanded his wallet.

At trial, Appellant relied solely on a theory of mistaken identity, pointing to what he believed were discrepancies in the identification testimony given by the witnesses, and contending, among other things, that Mainwaring's identification was tainted by the suggestive nature of the showup procedure the police conducted on the night of the offense. Appellant also requested lesser-included-offense instructions on assault and theft. The trial court denied both requests, finding that there was no evidence that would entitle Appellant to the instructions.

The jury found Appellant guilty of all three offenses. Appellant thereafter pled true to the enhancement paragraphs in the indictment, which consisted of four prior felony convictions. At sentencing, the State presented evidence that Appellant also had multiple misdemeanor convictions, including one assault family violence conviction, four separate convictions for theft, and one conviction of evading detention and failure to identify. The jury sentenced Appellant to 80 years on the robbery count, 20 years on the evading arrest count, and 35 years on the escape count, together with fines totaling $13,000. The trial court ordered all the sentences to run concurrently.

## DISCUSSION

### The Trial Court did Not Err in Refusing to Suppress Mainwaring's Identification of Appellant

#### *Background*

Before trial, Appellant filed a motion to suppress evidence of Mainwaring's identification of him as the perpetrator, alleging that it stemmed from an unduly suggestive "showup" conducted by police shortly after the robbery occurred. At the hearing on the motion, Officer Villagran testified that after Appellant was detained, he informed Mainwaring that the police had a suspect in custody and that he intended to take Mainwaring to the location where the sus-

pect was being detained to see if he could identify him as his assailant. Pursuant to the department's standard procedures, Officer Villagran required Mainwaring to first fill out a "show-up viewing form," which contained a written warning cautioning him that the detained suspect might not be the perpetrator of the offense, and that it was important that Mainwaring make an independent identification.[2] Officer Villagran also testified that he verbally cautioned Mainwaring that the detained suspect might not be the person who committed the offense.

Officer Villagran explained during the hearing that one of the purposes of the form was to require a crime victim to provide a written description of the alleged perpetrator of the offense prior to the showup, so that the witness's description would not be influenced by the showup itself. After Mainwaring filled out the form providing his written description of the suspect, Officer Villagran transported Mainwaring to the location where Appellant was being detained, where Mainwaring made a positive identification of Appellant. The trial court denied the motion to suppress, finding Officer Villagran's testimony credible and that the identification procedure was "not unduly suggestive[.]"

In his first issue, Appellant contends the trial court erred in denying his motion to suppress, contending that Mainwaring's identification was tainted by the showup, and that its admission deprived him of due process and a fair trial.

### Standard of Review

We review a trial court's denial of a motion to suppress under a bifurcated standard of review, in which we defer to the trial court's express and implied findings of fact, recognizing that the trial court is the exclusive trier-of-fact and the sole judge of the credibility of the witnesses, as well as the weight to be given their testimony. *Baird v. State*, 398 S.W.3d 220, 226 (Tex.Crim.App. 2013). However, we review *de novo* the legal significance of those facts, and the application of the law to those facts. *Id.*; *see also Amador v. State*, 221 S.W.3d 666, 673 (Tex.Crim.App. 2007) (applying a *de novo* standard of review to mixed questions of law and fact that do not turn on the credibility and demeanor of witnesses). We will sustain the trial court's ruling if it is reasonably supported by the record and correct on any theory of law applicable to the case. *See Laney v. State*, 117 S.W.3d 854, 857 (Tex.Crim.App. 2003).

### Applicable Law

A pretrial identification procedure may be so impermissibly suggestive and conducive to mistaken identification that subsequent use of that identification at trial would deny the accused due process of law. *Barley v. State*, 906 S.W.2d 27, 32–33 (Tex.Crim.App. 1995) (citing *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967)). Although courts have generally condemned the use of one-man infield showups in light of their suggestive nature, courts have also recognized that the admission of identification evidence following a one-man showup is not a

**2.** The form contained the following instructions: "You will be advised of the procedures for viewing the field identification. The fact that an individual is being shown to you, should not cause you to believe or guess that the guilty person(s) has been identified or arrested. This may or may not be the person who committed the crime. You are in no way obligated to identify anyone regardless of whether you make identification; the police will continue to investigate this incident. If you recognize anyone, please tell me how you recognize the individual. We are required to ask you to state in your own words, how certain you are of any identification."

*per se* violation of a defendant's due process rights. *See Garza v. State*, 633 S.W.2d 508, 512 (Tex.Crim.App. 1982) (opin. on reh'g); *Jimenez v. State*, 787 S.W.2d 516, 520 (Tex.App.–El Paso 1990, no pet.).

■ A two-step analysis is used to determine whether a defendant's due process rights were violated by the admission of a witness's identification testimony that was allegedly tainted by a suggestive pretrial identification procedure. *Pace v. State*, 986 S.W.2d 740, 744 (Tex.App.–El Paso 1999, pet. ref'd) (citing *Delk v. State*, 855 S.W.2d 700, 706 (Tex.Crim. App. 1993)); *see also Jackson v. State*, 657 S.W.2d 123, 129–30 (Tex.Crim.App. 1983). First, we examine whether the identification procedure itself was impermissibly suggestive. *Pace*, 986 S.W.2d at 744 (citing *Delk*, 855 S.W.2d at 706). Second, if we conclude that the identification procedure was suggestive, we determine whether the suggestive nature of the procedure gave rise to the substantial likelihood of irreparable misidentification. *Id.* The admission of identification testimony does not violate due process so long as the identification possesses sufficient aspects of reliability. *Garza*, 633 S.W.2d at 512–13.

■ The second step in the analysis, which centers on whether there is a substantial likelihood of a misidentification, is the most critical step in the analysis, because it is the danger of a misidentification that implicates the defendant's due process rights. *Jimenez*, 787 S.W.2d at 520. Consequently, even if an unnecessarily suggestive identification procedure was used by police, the witness's identification testimony may nevertheless be admissible if there is evidence that the witness's identification was the product of an independent source, namely the observations made at the time of the offense. *Id.* (citing *Jackson*, 657 S.W.2d at 130; *Williams v. State*, 477 S.W.2d 885 (Tex.Crim.App. 1972)). If an independent origin is shown, we may conclude that the pretrial identification procedure did not result in a substantial likelihood of misidentification. *Id*; *Herrera v. State*, 682 S.W.2d 313, 318 (Tex.Crim.App. 1984); *see also Garza*, 633 S.W.2d at 512–13 (despite the suggestive nature of a pretrial identification procedure, the admission of identification testimony does not violate due process as long as the identification possesses sufficient aspects of reliability).

■■ In making this determination, we consider the totality of the circumstances, relying on, among other things, the following five factors: (1) the witness's opportunity to view the suspect at the time of the offense; (2) the degree of attention the witness focused on the suspect at the time of the offense; (3) the accuracy of any descriptions provide by the witness prior to the allegedly suggestive identification procedure; (4) the witness's level of certainty of his identification; and (5) the time between the crime and the identification procedure. *Garza*, 633 S.W.2d at 513; *Gamboa v. State*, 296 S.W.3d 574, 582 (Tex.Crim.App. 2009). These and other relevant factors are weighed against the corrupting effect of the unduly suggestive identification. *Pace*, 986 S.W.2d at 745 (citing *Delk*, 855 S.W.2d at 706). The defendant bears the burden to show by clear and convincing evidence that the in-court identification was unreliable. *See Delk*, 855 S.W.2d at 706; *Pace*, 986 S.W.2d at 744.

### Analysis

■ Appellant argues that the one-person showup the police conducted on the night of the offense rendered it unduly suggestive because when Mainwaring arrived at the location of the showup, Appellant was being detained in handcuffs, surrounded by several police officers and police cars with their flashers on. Appel-

lant also points out that before Mainwaring made his identification, the police focused a spotlight on Appellant, while Mainwaring remained in the backseat of the patrol car.[3] Appellant argues that these circumstances sent a message to Mainwaring that the police believed Appellant was in fact the perpetrator of the crime.

Although we agree the identification procedure utilized was suggestive, we conclude that Mainwaring's identification testimony was nevertheless admissible. Our conclusion turns on the second factor in the analysis, *i.e.*, whether, based on the totality of the circumstances, Mainwaring's testimony was sufficiently reliable to allow its admission at trial despite the suggestive nature of the showup.

### Application of the Five–Factor Test

The first factor in our analysis centers on Mainwaring's opportunity to view the suspect. Appellant argues that Mainwaring did not have a good opportunity to view the suspect, pointing out that the incident occurred "in a dark area at night," and that Mainwaring "did not have a good opportunity to view the criminal." This characterization of the facts, however, is not entirely accurate. Mainwaring testified at trial that he encountered Appellant and the other suspect at least twice on the night of the offense, and that he spoke directly to the two men when they asked him for directions. Mainwaring also testified that after Appellant punched him, Appellant stood directly in front of him, pointing at him and demanding his wallet. Further, Mainwaring estimated that Appellant was standing no more than three feet away from him when he demanded his

wallet, and was close enough to Mainwaring to enable Appellant to reach out and grab his wallet. Moreover, although Mainwaring testified that it was "dark" at the time of the offense, the video recording of the encounter indicates that the offense occurred in a relatively well-lit area and that the suspects were clearly visible in the recording, thereby giving rise to an inference that Mainwaring would have been able to distinguish their features despite the late hour when the offense occurred. Therefore, we conclude that Mainwaring had an ample opportunity to view Appellant both before and during the robbery itself. *See, e.g., Jackson,* 657 S.W.2d at 129–30 (witnesses had an "excellent opportunity" to view perpetrator of crime where they were three or four feet away); *Garza,* 633 S.W.2d at 512–13 (identification was reliable where the witnesses were able to observe the defendant from only ten yards away).

The second factor is the degree of attention that Mainwaring focused on the suspect. Appellant finds it significant that Mainwaring was clearly "traumatized" and "disoriented" by the robbery, arguing that this undoubtedly would have affected Mainwaring's ability to provide a reliable identification of the suspect. In support of his argument, Appellant relies almost exclusively on a psychological treatise, not introduced into evidence at trial, for the proposition that when a witness has experienced a marked degree of stress, his "perceptual abilities are known to decrease significantly." While we recognize that a violent crime *may* have a stressful psychological effect on a victim, if we were to follow Appellant's argument to its logical conclusion, we would be required to con-

---

3.  Officer Villagran testified it is standard department procedure to have a crime victim or witness remain in the backseat of a patrol car during a showup while a light is shown on the detained suspect, because it protects the identity of the witness by enabling the witness to observe the suspect without the suspect being able to see the witness.

clude, in the abstract, that almost any victim of a violent crime would be unable to provide reliable identification testimony in light of their stress levels. This we decline to do. Instead, looking to the particular facts of this case, we conclude that there is nothing in the record to suggest that Mainwaring's attention was diverted or that he was otherwise unable to focus on the suspect either before or after the crime occurred.

The third factor is the accuracy of Mainwaring's description of the suspect prior to the showup. Mainwaring provided a verbal description of the suspect to Officer Villagran at the scene of the offense, as well as a written description in the show-up viewing form he filled out at the police station prior to the showup. The verbal description he gave Officer Villagran was that of a tattooed Hispanic male of average height, with short hair, who was wearing jeans and a "whitish" tank top. Mainwaring's written description of the suspect was essentially the same, but added that the suspect had "some facial hair," and that the suspect's hair was "longer on top and shaved on sides." Mainwaring clarified at trial, that by facial hair, he meant that the suspect had a "five-o-clock" shadow, as opposed to any significant facial hair.[4]

Appellant claims that Mainwaring's description of the suspect prior to the show-up was highly inaccurate, starting first with Mainwaring's description of the suspect as a Hispanic male, asserting that he is not Hispanic. Appellant, however, is making this argument for the first time on appeal. He made no effort to dispute his ethnicity at trial, either through argument to the jury or by producing evidence to

document that he was not of Hispanic origin. Not one witness at trial questioned Mainwaring's description of Appellant as Hispanic, and in fact Officer Villagran expressed his opinion at the pretrial hearing on the motion to suppress that Appellant appeared to be Hispanic and defense counsel never disputed that fact in his argument to the court regarding the accuracy of the description. Further, on appeal, Appellant attempts to support this argument by simply referring, without explanation, to his arrest photograph, which he apparently believes demonstrates that he is not Hispanic. This photograph, however, is in no way dispositive of Appellant's claim that he was not Hispanic. At most the photograph shows a man of dark complexion who may or may not have been of Hispanic origin. As such, we conclude that the arrest photograph does not call into question the accuracy of Mainwaring's description of the suspect.

Appellant also relies on this same arrest photograph to argue that Mainwaring's identification of the suspect was inaccurate, contending that the photograph reveals no facial hair and demonstrates that Appellant's hair was completely shaved at the time of his arrest, in contrast to Mainwaring's description of the suspect as having hair that was longer on top and shaved on the side. This characterization of the photograph is inaccurate. As Mainwaring testified at trial, the arrest photograph does in fact reveal the presence of a "little bit" of facial hair and "some scruff" on Appellant's face. Further, although the arrest photograph is not entirely clear, it appears to show, as Mainwaring also testi-

---

4. In his written statement, Mainwaring indicated that the tank top the suspect was wearing was gray, rather than white. Mainwaring clarified at trial, however, that he believed the tank top may have been "white with gray." The photograph of Appellant at the time of his arrest demonstrated that he was wearing a white tank top, which at the time had a considerable amount of dirt on it. In his brief, Appellant does not point to this difference as a significant discrepancy in Mainwaring's description of the suspect.

fied at trial, that Appellant may have had slightly more hair on the right side of his head at the time of his arrest. Although this is not entirely identical to Mainwaring's description, it does validate Mainwaring's perception that Appellant's hair was not entirely shaved.

Further, Mainwaring's description of the suspect was highly accurate in several important respects, including that Appellant was of medium height, was wearing a "whitish tank top" and jeans, and had visible tattoos—facts that were borne out by Appellant's arrest photograph.[5] We conclude that despite the existence of minor discrepancies in the descriptions Mainwaring provided of the suspect, when viewed in their totality, his descriptions were sufficiently accurate to ensure the reliability of the identification.[6] *See, e.g., Woodard v. State*, 931 S.W.2d 747, 751 (Tex.App.—Waco 1996, no pet.) (upholding admissibility of identification, where the only discrepancies in the record centered on minor discrepancies in the clothing worn by the suspect); *Williams v. State*, 985 S.W.2d 240, 243 (Tex.App.–Beaumont 1999, no pet.) (holding that minor differences in description of the suspect's height and weight did not affect the reliability of the identification); *see also Garza*, 633 S.W.2d at 512–13 (discrepancies in the witnesses' testimony went to the weight to be given the evidence and not to its admissibility).

The fourth factor is the certainty of Mainwaring's identification of Appellant as the suspect. Mainwaring informed Officer Villagran at the time of the showup that he was "certain" and "sure" of his identification of Appellant as the perpetrator of the robbery, and since that time, Mainwaring has never once waivered from that certainty. In fact, at trial, Mainwaring expressly denied that his identification of Appellant at the showup was in any way influenced by either the circumstances surrounding the showup or anything the police officers had said to him. Instead, he made the identification based solely on his belief that Appellant was "the guy who took [his] wallet."

Appellant does not contend Mainwaring was not certain in his identification, and appears to be willing to concede that Appellant was in fact confident in his identification. Instead, Appellant again relies on a psychological argument based on scholarly treatises, not introduced into evidence, which indicate there may be an inverse correlation between the "confidence" with which a witness has made an identification and the accuracy of that identification. Our task, however, is not to make psychological pronouncements, but to determine from the evidence in the record whether Mainwaring's identification of Appellant was sufficiently reliable based on the level of certainty with which Mainwaring made the identification. Since Appellant does not dispute that Mainwaring's level of certainty was extremely high and unwavering, we conclude that this factor weighs in favor of a reliable identification.

The fifth factor is the length of time between the crime and the identification procedure. The shorter the period of time between the crime and the identification, the less likely a witness will have forgotten the physical characteristics of the perpetrator, and therefore the more reliable the identification will be. *See, e.g., Garza*, 633

---

5. Appellant's criminal history records indicate that he is 5'9"—exactly in the middle of Mainwaring's written estimate in the show-up viewing form, which placed the suspect's height between 5'7" and 5'11".

6. We also note that all of the officers at the scene of Appellant's arrest believed he matched the description Mainwaring initially provided to Officer Villagran, which Officer Villagran had broadcast on his radio.

S.W.2d at 512–13 (by viewing a suspect immediately after the commission of the offense—which in this case was within a half hour—a witness is allowed to test his recollection while his memory is still fresh and accurate). Although the exact period of between the crime and the identification time is not clear from the record in the present case, it appears that the showup occurred less than an hour after the offense was committed. Appellant acknowledges that the showup was conducted "extremely quickly" after the offense was committed, and therefore concedes this factor weighs in favor of finding the identification reliable.

Accordingly, considering all the factors and the totality of the circumstances, we conclude that regardless of the suggestive nature of the showup, Mainwaring's identification testimony was sufficiently reliable to avoid any substantial likelihood of irreparable misidentification. Therefore, Appellant's due process rights were not violated. Issue One is overruled.

## The Trial Court did Not Err in Refusing to Instruct the Jury on the Lesser–Included Offense of Assault

In his second issue, Appellant contends the trial court erred in refusing to submit to the jury his requested lesser-included instruction on assault. We disagree.

### Standard of Review and Applicable law

We conduct a two-part *Aguilar/Rousseau* analysis to determine whether the trial court was required to provide the jury with an instruction on a requested lesser-included offense. *See Rousseau v. State,* 855 S.W.2d 666, 672–73 (Tex.Crim.App. 1993); *see also State v. Meru,* 414 S.W.3d 159, 162 (Tex.Crim.App. 2013); *Cavazos v. State,* 382 S.W.3d 377, 382 (Tex.Crim.App. 2012); *Shannon v. State,* No. 08–13–

00320–CR, 2015 WL 6394922, at *8 (Tex. App.–El Paso Oct. 21, 2015, no pet.).

First, we must determine as a matter of law whether the requested instruction is indeed a lesser-included offense of the offense charged, using the "cognate-pleadings" approach. *Meru,* 414 S.W.3d at 162; *Cavazos,* 382 S.W.3d at 382. To do this, we compare the elements of the offense as alleged in the indictment with those of the requested lesser offense. *Meru,* 414 S.W.3d at 162. Under this approach, an offense is a lesser-included offense of a charged offense if the indictment alleges all the elements of the lesser-included offense, or if the indictment alleges elements plus facts from which all the elements of the lesser-included offense may be deduced. *See McKithan v. State,* 324 S.W.3d 582, 587 (Tex.Crim.App. 2010). This is a question of law that is independent of the evidence produced at trial, and is therefore capable of being performed prior to trial. *Rice v. State,* 333 S.W.3d 140, 144 (Tex.Crim.App. 2011); *see also Meru,* 414 S.W.3d at 162; *Wortham v. State,* 412 S.W.3d 552, 555 (Tex.Crim.App. 2013).

The second prong depends on the evidence presented at trial, and requires a court to determine whether there is any evidence in the record that would permit a rational jury to find that if the defendant is guilty, he is guilty only of the lesser offense. *See Meru,* 414 S.W.3d at 162–63 (citing *Hall,* 225 S.W.3d at 536); *Guzman v. State,* 188 S.W.3d 185, 188–89 (Tex.Crim.App. 2006). In making this determination, a reviewing court should not consider whether the evidence presented was "credible, controverted, or in conflict with other evidence." *Moore v. State,* 969 S.W.2d 4, 8 (Tex.Crim.App. 1998); *Shannon,* 2015 WL 6394922, at *8. "[A]nything more than a scintilla of evidence may be sufficient to entitle a defendant to a charge

on a lesser offense." *Cavazos,* 382 S.W.3d at 385; *see also Meru,* 414 S.W.3d at 163.

Nevertheless, meeting this standard requires "more than mere speculation—it requires affirmative evidence that both raises the lesser-included offense and rebuts or negates an element of the greater offense." *Cavazos,* 382 S.W.3d at 385; *see also Shannon,* 2015 WL 6394922, at *8. Therefore, it is not enough that the jury may disbelieve crucial evidence pertaining to the greater offense, but rather, there must be some evidence directly germane to the lesser-included offense for the finder of fact to consider before an instruction on a lesser-included offense is warranted. *See Skinner v. State,* 956 S.W.2d 532, 543 (Tex.Crim.App. 1997); *see also Cavazos,* 382 S.W.3d at 385; *Hampton v. State,* 109 S.W.3d 437, 441 (Tex.Crim.App. 2003).

The State acknowledges, and we agree, that under the cognate-pleading approach, assault was a lesser-included offense of robbery as charged in the indictment. Appellant was charged by indictment with intentionally, knowingly, and recklessly causing "bodily injury" to Mainwaring, which is the key element of a charge of assault under Section 22.01(a) of the Penal Code.[7] *See, e.g., Martinez v. State,* 599 S.W.2d 622, 624 (Tex.Crim.App. 1980) (recognizing that the offense of assault by causing bodily injury is a lesser-included offense of robbery if alleged to have been committed by causing bodily injury); *Jones v. State,* 984 S.W.2d 254,

258 (Tex.Crim.App. 1998) (finding that assault was a lesser-included offense of robbery); *see also Ex Parte Denton,* 399 S.W.3d 540, 547 (Tex.Crim.App. 2013) (where defendant's indictment for aggravated robbery pled that he committed the robbery by threatening another person with imminent bodily injury and that he used or exhibited

a deadly weapon during the commission of that offense, "aggravated assault is a lesser-included offense of aggravated robbery because 'it is established by proof of the same or less than all the facts required to establish the commission of the offense charged' "). Therefore, we turn our attention to the second step in the analysis to determine whether there was any affirmative evidence from which a rational jury could have found that if guilty, Appellant was only guilty of the lesser offense of assault, and not robbery.

Appellant points out that, as alleged in the indictment, the State was required to prove that he struck Mainwaring "in the course of committing a theft" and that the assault was committed with the intent of obtaining or maintain control of Mainwaring's property. Appellant contends that the State presented no direct evidence that he struck Mainwaring with the intent of obtaining his property, and that, based on the evidence presented at trial, the jury could have instead concluded that he struck Mainwaring for a different reason, such as due to his frustration with Mainwaring for ignoring him and refusing his request for directions. He further contends that the jury could have concluded

---

7. The indictment alleged that Appellant committed robbery in the following manner: "[Appellant] did then and there while in the course of committing theft and with the intent to obtain and maintain control of property, intentionally, knowingly, and recklessly cause bodily injury to Jackson Mainwaring by striking Jackson Mainwaring about the head with

[Appellant's] hand." In comparison, assault is defined in Section 22.01 of the Penal Code as follows: "(a) A person commits an offense if the person: (1) intentionally, knowingly, or recklessly causes bodily injury to another, including the person's spouse[.]" TEX. PENAL CODE ANN. § 22.01 (West Supp. 2016).

that his demand for Mainwaring's wallet was simply an "afterthought," unrelated to the assault, and that the assault was therefore "completed" before he demanded Mainwaring's wallet. He then reasons that this would have allowed a rational jury to conclude that the assault did not occur "in the course of committing a theft," as required for a robbery conviction. There are several problems with this argument.

■ First, when the Legislature adopted the current version of the robbery statute, it assigned a broad meaning to the term, "in the course of committing theft," to encompass virtually any act occurring immediately before, during, or after a theft. *See, e.g., Sorrells v. State,* 343 S.W.3d 152, 157–58 (Tex.Crim.App. 2011) (noting that the Legislature's comments to the revised statute made it clear that violence used or threatened in the course of committing theft includes not only "violent conduct antecedent to a completed theft," but conduct occurring during the defendant's attempt to escape after the offense has been completed); *see also* TEX. PENAL CODE ANN. § 29.01(1) (West 2011) (defining "[i]n the course of committing theft" to mean "conduct that occurs in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of theft"). Therefore, it is sufficient that the assaultive act is shown to have occurred immediately before, during, or after the theft, with no significant break in the chain of events, in order to support a defendant's conviction for robbery. *See, e.g., Trott v. State,* No. 08–11–00305–CR, 2013 WL 1030140, at **1–3 (Tex.App.–El Paso March 13, 2013, pet. ref'd) (not designated for publication) (sufficient evidence supported the defendant's conviction for aggravated robbery, where the evidence revealed that the defendant first committed a theft from a liquor store, and minutes later, threatened the owner with a

knife with no intervening activity between the theft and the threat); *Oggletree v. State,* 851 S.W.2d 367, 368–70 (Tex.App.–Houston [1st Dist.] 1993, pet. ref'd) (evidence was sufficient to support defendant's aggravated robbery conviction where defendant engaged in one continuous criminal episode, in which he committed a theft and thereafter displayed a knife while attempting to escape); *Rabb v. State,* 681 S.W.2d 152, 154 (Tex.App.–Houston [14th Dist.] 1984, pet. ref'd) (defendant's assaultive conduct occurred "in the course of committing theft" where he assaulted his victim while attempting to escape in what was an unbroken chain of events). Moreover, in light of the broad meaning assigned to the definition of robbery, courts have recognized that a jury is permitted to infer from the fact that a defendant assaulted his victim either immediately before, during, or after committing a theft that he did so with the intent of either obtaining or maintaining control of the victim's property. *See, e.g., Cooper v. State,* 67 S.W.3d 221, 224 (Tex.Crim.App. 2002) (recognizing the "general rule is … that a theft occurring immediately after an assault will support an inference that the assault was intended to facilitate the theft").

In the present case, the evidence demonstrated that Appellant struck Mainwaring in the face immediately before the theft took place, and therefore the jury was entitled to infer that he did so in the course of committing the theft, and with the intent of facilitating the theft. In order to be entitled to a lesser-included offense instruction, Appellant was required to point to some affirmative evidence in the record to rebut that inference, and to allow a jury to infer that he had a different intent in committing the assault, which could have, among other things, included his own testimony of why he struck Mainwaring. *See, e.g., Jones v. State,* 984

S.W.2d 254, 257–58 (Tex.Crim.App. 1998) (defendant was entitled to a lesser-included offense instruction on the offenses of assault where defendant, who was charged with robbery, for stealing items from store and striking the stores' loss prevention employees while attempting to escape, testified at trial that he did not steal any items and that he only struck the employees in self-defense); *see also Williams v. State*, 314 S.W.3d 45, 51–52 (Tex.App.–Tyler 2010, pet. ref'd) (defendant, who was alleged to have committed robbery by stealing various items from a car and thereafter attacking a witness to escape arrest, was entitled to an instruction on the lesser-included offense of theft, where he testified that he only attacked the witness in self-defense, and not as a means of maintaining control over the stolen property). Appellant, however, presented no affirmative evidence to support his theory that he harbored a different intent when he assaulted Mainwaring. Appellant's theory that he struck Mainwaring because he was perturbed by Mainwaring's behavior in ignoring him is based on mere speculation, and did not warrant a lesser-included instruction on assault. *See Saunders v. State*, No. 14–02–00734–CR, 2004 WL 1116938, at *1 (Tex.App.–Houston [14th Dist.] May 20, 2004, no pet.) (mem. op., not designated for publication) (defendant was not entitled to a lesser-included offense instruction on assault, where the defendant failed to come forward with any affirmative evidence to support his theory that he formed the intent to commit theft after he assaulted his victim); *see also Robertson v. State*, 871 S.W.2d 701, 707 (Tex.Crim. App. 1993) (jury could not have rationally concluded that defendant, who was convicted of capital murder based on a theory that he murdered his victim in the course of committing a robbery, formulated an intent to steal items from the victim after the murder occurred, where the only evidence pre-

sented at trial demonstrated that the defendant entered the victim's home, shot her, and stole valuables from her, leading to the only rational inference that defendant developed the intent to steal the items either before or during the murder); *see* generally *Cavazos*, 382 S.W.3d at 385 (requiring more than "mere speculation" to support a lesser-included instruction).

Appellant also argues that he was entitled to a lesser-included instruction on assault based on the testimony of the 911 operator, Carlos Deanda, who was the only witness to the offense other than the victim himself. In particular, Appellant points out that Deanda testified that he only observed an "altercation," which Appellant argues would have at most allowed the jury to conclude that an assault took place. Appellant asserts that because Deanda did not testify that he observed a theft, the jury could have found that no theft occurred, and that the only offense that occurred was an assault.

Appellant's reasoning is flawed. Deanda made it clear in his testimony that although he observed an "altercation" take place between the three men, he was not in a position to observe exactly what had occurred, and that he primarily observed the aftermath of the offense, with the two men running away from the victim. Deanda's testimony thus is not *affirmative* evidence that a theft did *not* occur—only that he was unable to discern what was actually occurring between the parties. The mere fact that a witness only observed an assault, but not the actual theft itself, is not "affirmative evidence" that a theft did not take place, and, standing alone, does not entitle a defendant to a lesser-included offense instruction on assault. *See, e.g., Saunders*, 2004 WL 1116938, at *2 (defendant was not entitled to lesser-included offense instruction on assault, where the evidence indicated that the defendant and

victim had been in a fight but no one observed the defendant take the victim's belongings, where the police later found his belongings in the defendant's possession); *see also Hampton v. State,* 109 S.W.3d 437, 441 (Tex.Crim.App. 2003) (where defendant was charged with aggravated sexual assault based on his use of a knife, the fact that the knife was never found was not "affirmative evidence" that no knife was used during the assault, and therefore did not entitle the defendant to an instruction on the lesser-included offense of sexual assault). Although Deanda did not directly observe the theft take place, the evidence presented at trial established that Mainwaring's property was taken during the "altercation" that Deanda witnessed. Therefore, Deanda's testimony that he did not observe the theft itself take place did not constitute "affirmative evidence" that only an assault took place, and did not entitle Appellant to a lesser-included offense instruction on that offense.

For similar reasons, we reject Appellant's related argument that the jury could have relied on the fact that the 911 call center's video recording did not capture the theft taking place. The State established that the camera was not in a position to physically capture either the assault or the theft, and only captured its aftermath when the suspects were fleeing the scene. We therefore conclude that the recording did not constitute affirmative evidence that a theft did not take place.

Appellant has failed to point to any affirmative evidence in the record from which a rational jury could have concluded that if Appellant was guilty, he was guilty only of assault, and not robbery. Accordingly, we conclude that the trial court did not err in denying Appellant's request for a lesser-included-offense instruction on assault. Issue Two is overruled.

## The Trial Court did Not Err in Refusing to Instruct the Jury on the Lesser–Included Offense of Theft

Appellant also contends the trial court erred in denying his request for a jury instruction on the lesser-included offense of theft. We apply the same standard of review and utilize the same two-step *Aguilar/Rousseau* analysis set forth above to determine whether the trial court was required to provide the jury with the requested instruction. *See Shannon,* 2015 WL 6394922, at *8.

■ The State acknowledges, and we agree, that theft was a lesser-included offense of robbery, as charged in the indictment. The indictment's allegations of robbery included, by necessity, the statutory element that Appellant caused bodily injury to his victim "in the course of committing theft[.]" It is well settled that when the indictment alleges that a defendant committed robbery by causing bodily injury or threatening to cause bodily injury in the "course of committing theft," the offense of theft is necessarily a lesser-included offense of the robbery. *See Earls v. State,* 707 S.W.2d 82, 84–85 (Tex.Crim. App. 1986) ("[t]heft, by whatever method committed," is a lesser-included offense of robbery, when the indictment alleges that the defendant committed a violent act in the course of committing theft); *see also Jones,* 984 S.W.2d at 258 (finding theft to be a lesser-included offense of robbery); *Bignall v. State,* 887 S.W.2d 21, 23 (Tex. Crim.App. 1994) (finding that theft was a lesser-included offense of aggravated robbery); *Lafrienza v. State,* No. 08–13– 00121–CR, 2015 WL 4985349, at *5 (Tex. App.–El Paso Aug. 21, 2015, pet. ref'd) (recognizing that theft is necessarily included in the alleged elements of the greater offense of robbery). Therefore, we turn our attention to the second step in the analysis to determine whether there was

any affirmative evidence presented at trial from which a rational jury could have found that if guilty, Appellant was only guilty of the lesser offense of theft, and not robbery.

■ Appellant relies on one isolated passage in Mainwaring's testimony to argue that a rational jury could have found that he did not commit an assault during the course of the theft, and that he instead only committed a theft. He points to Mainwaring's testimony that shortly before Appellant demanded his wallet, he felt a sharp pain, but did not initially realize what had caused the pain. From this single statement, Appellant argues that the jury could have inferred that no assault took place during the course of the theft. We disagree.

■ A single item of evidence "cannot be plucked out of the record and examined in a vacuum." Instead, the entire record must be examined to determine whether there was more than a scintilla of affirmative evidence to support a requested instruction on a lesser-included offense. *See, e.g., Godsey v. State,* 719 S.W.2d 578, 584 (Tex.Crim.App. 1986); *see also Ramos v. State,* 865 S.W.2d 463, 464–65 (Tex.Crim. App. 1993) (a single statement in the defendant's testimony, viewed in the context of the entire record, was insufficient to raise a lesser-included offense).

Our review of the record leads us to conclude that Appellant has taken Mainwaring's statement out of context. Immediately after testifying that he did not initially realize why he was feeling pain and that he was "disoriented" from the pain, Mainwaring stated that he soon realized he had been "punched in the face." Further, Main-

waring thereafter testified consistently and repeatedly that Appellant had struck him in the face immediately before demanding his wallet. Officer Villagran also testified that when Mainwaring flagged him down shortly after the offense occurred, Mainwaring was "holding his mouth with his right hand" and informed him that he had been "punched" in the face by the suspect. Moreover, in the show-up viewing form Mainwaring filled out at the police station, he expressly stated that the suspect had "punched [him] in the face." Finally, we note that the police photographs taken of Mainwaring when he arrived at the police station confirmed that he had suffered injuries to his face. Based on our review of the record, we conclude that Mainwaring's single statement that he did not initially realize he had been punched is not affirmative evidence that no assault took place during the course of the theft.[8]

Appellant renews his earlier argument that even if an assault did occur, a rational jury could have concluded that the assault was not in the course of the theft, but was instead committed for an entirely different reason than to facilitate the theft (*i.e.,* because of his frustration with Mainwaring), and that the assault was therefore "completed" before the theft occurred. We once again reject this argument. As explained above, if Appellant had come forward with either affirmative evidence to suggest that there was a break in the chain of events between the commission of an assault and a theft or affirmative evidence that he had a different intent in committing the assault, he might have been entitled to a lesser-included offense instruction on either assault or theft.

8. Appellant once again points to the lack of evidence on the call center's video recording, pointing out that it did not capture either a theft or an assault. However, as explained above, the video camera was not in a position to capture either the assault or the theft, and therefore, does not constitute affirmative evidence that an assault did not take place during the course of the theft.

*Jones,* 984 S.W.2d at 257–58 (defendant was entitled to lesser-included offense instructions on both assault and theft, where defendant's testimony claiming that he did not commit a theft and that he only assaulted store employees in self-defense would have permitted a rational jury to believe that he was "guilty only" of either of those lesser-included offenses); *see also Sweed v. State,* 351 S.W.3d 63, 69 (Tex. Crim.App. 2011) (evidence supported an instruction on the lesser-included offense of theft, where the defendant did not use a weapon until almost a half-hour after the theft, and did so after hiding the stolen items in another location, thereby raising an inference that he did not use the weapon in the course of the theft or in the immediate flight from the theft.).

Instead, the only evidence presented at trial demonstrated that Appellant assaulted Mainwaring and immediately thereafter demanded his wallet, leading to only one logical inference—that Appellant committed an assault during the course of a theft. Accordingly, no rational jury could have found that if Appellant was guilty, he was only guilty of theft and not a robbery. We therefore conclude that the trial court did not err in denying Appellant's request for a lesser-included offense instruction on theft. *See, e.g., Lopez v. State,* No. 08–05–00032–CR, 2007 WL 258428, at *6 (Tex. App.–El Paso Jan. 31, 2007, pet. ref'd) (not designated for publication) (trial court did not err in denying defendant's request for a lesser–included offense instruction on theft where the only evidence presented at trial demonstrated that the defendant assaulted a store security officer while attempting to escape capture after committing a theft, and defendant presented no evidence to support a finding that his only offense was a theft without an assault). Issue Three is overruled.

## The Trial Court's Comments to the Jury Panel did not Deprive Appellant of a Fair and Impartial Trial

In his fourth issue, Appellant contends the some of the trial court's statements to the jury panel during voir dire constituted an improper comment on his constitutional right to remain silent or evidenced a bias against him, thereby depriving him of his right to a fair and impartial trial. Although Appellant did not make a timely objection, or even raise the issue at any time during or after trial, Appellant contends the trial court's comments were so egregious that they constituted fundamental error, warranting reversal of his conviction despite his failure to object.

### Standard of Review and Applicable Law

In the absence of a timely objection at trial, we analyze a defendant's complaint on appeal to determine whether the complaint rises to the level of fundamental or egregious error. *See, e.g., Blue v. State,* 41 S.W.3d 129, 131 (Tex.Crim.App. 2000) (recognizing that appellate courts are authorized to address fundamental errors affecting substantial rights although they were not brought to the attention of the trial court); *see also Unkart v. State,* 400 S.W.3d 94, 99 (Tex.Crim.App. 2013) (recognizing that "some appellate complaints do not have to be preserved by a timely request for relief at the trial level").

A comment on an accused's failure to testify violates the state and federal constitutional privileges against self-incrimination. *See Canales v. State,* 98 S.W.3d 690, 695 (Tex.Crim.App. 2003). Therefore, "[n]either the trial judge nor the prosecutor can comment on the failure of an accused to testify." *Bustamante v. State,* 48 S.W.3d 761, 764 (Tex.Crim.App. 2001). In determining whether a comment violated a defendant's constitutional right

to remain silent, the offending language must be viewed from the jury's standpoint. *Id.* at 765. Any implication that the comment referred to the defendant's failure to testify must be clear. *Id.* A reviewing court must analyze the context in which the comment was made to determine whether the language used was "manifestly intended or was of such a character that the jury would necessarily and naturally take it as a comment on the defendant's failure to testify." *Id.* A mere indirect or implied allusion to the defendant's failure to testify does not violate the accused's rights. *Wead v. State*, 129 S.W.3d 126, 130 (Tex.Crim. App. 2004); *Patrick v. State*, 906 S.W.2d 481, 490–91 (Tex.Crim.App. 1995).

### The Challenged Comment

During jury voir dire, the trial court initially explained to the jury panel the defendant's constitutional right against self-incrimination as follows:

> We also have what is called the Fifth Amendment right against self-incrimination. And what will happen is, during the trial of the case you will hear witnesses come and testify from this witness stand right over here .... The one person that the state cannot call to that witness stand under any circumstances is the defendant, Mr. Kelly Knott. They cannot call him; okay? Absolutely prohibited. Now, Mr. Knott may elect to testify if he so desires. It is his right. He can testify if he wants to, but he does not have to testify. And our Constitution guarantees him a right that says, no, you cannot hold it against any defendant if they choose not to testify. This is that right against self-incrimination.

The trial court then provided an example of a situation in which a defendant might choose to remain silent and not testify on his own behalf, weaving in a discussion of not only the right against self-incrimina-

tion, but also the concept of the presumption of innocence as well:

> Let me give you kind of, I guess, a little bit of a humorous example of how that could come up. Let's say you were ... in municipal court ... I am going to actually give you some advice. I don't know if you will follow it. But if you are over there in municipal court, and if something—they are charging you with a speeding ticket or any kind of a ticket— okay?—then the city attorney, they read the charge.
>
> Then all of a sudden let's say the judge turns and says, "Okay. Where is the police officer?" And they go, "Well, he is not here, you know. He is missing. We don't have our witness to testify." Okay. Now, you could still testify, okay, and say, "Wait a minute. I want to give my side of the story here. I wasn't going 62. I was only going 55 in that 50–mile-an-hour zone." You know, you have probably just convicted yourself by testifying. Because, well, the judge will probably agree and say, "Fine. We will go to 62 instead of 55, and we will give you a ticket and find you guilty of going five miles over the speed limit."
>
> So you didn't have to testify. There was no evidence against you. You would absolutely have been found not guilty because of the presumption of innocence. So that might not always be a good idea to speak up.

The trial judge further elaborated on the defendant's constitutional rights as follows:

> So there might be a lot of reasons why not to testify no matter what the facts were. Even if you were a hundred percent innocent, it still might not be a good idea. So is there anybody who would hold it against this defendant or any defendant if they elected not to testify in their own case? Anybody feel

that way? Okay. I take it by your silence that none of you would.

Okay. Now, like I said, there will be witnesses that will testify in this case. And I don't know how many will be called by the state or how many will be called by the defense. The defense doesn't have to call any witnesses if they don't want to. Remember, they have got their presumption of innocence and the state has the burden of proving their case beyond a reasonable doubt.

### Analysis

■ Appellant contends that the example given by the trial court of the speeder who unwittingly took the stand and provided incriminating testimony was improper because it "assumes [that] someone is not testifying because they are guilty and that their testimony would have provided the necessary evidence for the state to prove [its] case."[9] He contends this example sent a clear message to the jury that only a guilty defendant would not take the stand to testify on his own behalf, and concludes that it was therefore a direct comment on his constitutional right to remain silent, thereby constituting fundamental error.

Appellant relies primarily on the Court of Criminal Appeals plurality opinion in *Blue v. State*, arguing that the Court in *Blue* found a "similar" unobjected-to example given by the trial court during voir dire to be fundamental error. In *Blue*, the trial judge explained to the jury panel that there might be a variety of reasons why a defense attorney might not put his client on the stand, which might have nothing to do with the client's guilt or innocence, such

as when the defendant has a speech impediment or simply "look[s] guilty." 41 S.W.3d at 130. The judge also spoke in the first person, explaining that if he was representing a client, such as "Sister Teresa," who had a clear appearance of innocence, he would put her on the stand to testify, even if she had admitted her guilt to him, because no one would suspect that she would lie on the stand. *Id.*

Appellant contends the Court in *Blue* found this "hypothetical" to be "fundamental error." The Court's plurality opinion in *Blue* did not discuss this hypothetical example in its analysis, however. Instead, the opinion was concerned exclusively with the unrelated and much more egregious series of statements by the trial judge to the jury panel, in which, among other things, he expressed his displeasure that the trial was being delayed while defense counsel was speaking with his client about whether he wanted to enter a plea or go to trial. *Id.* The trial judge told the jury panel that the State had extended a plea offer to the defendant, and that the defendant had been going "back and forth" on whether to accept it, thereby "holding up [his] docket." *Id.* The trial judge also informed the jury that he had already told the defendant that he needed a decision on the State's offer, and that he had "enough of that, we are going to trial." *Id.* The trial judge then stated that he would "prefer the defendant to plead," as it "gives us more time to get things done," and apologized to the jury panel for making them wait for the defendant's decision, implying that the delay was wasting the panel and the court's time. *Id.* The plurality opinion held that these comments "tainted the pre-

---

**9.** Appellant also asserts, without explanation, that he believes the trial judge's comments herein sent a message to the jury that "only a few people that do not testify are innocent." Appellant, however, does not explain how or why he believes that the judge's comments

sent this message to the jury, and our review of the record indicates that the trial judge made no comments or suggestions in his remarks to the jury that could be interpreted in that manner.

sumption of innocence," and adversely affected the defendant's right to a fair trial, thereby constituting fundamental error that required reversal even in the absence of an objection.[10] *Id.* at 132.

The Court of Criminal Appeals recently addressed its prior holding in *Blue* in *Unkart v. State*. In *Unkart*, the Court was faced with a situation in which the trial judge was explaining a defendant's constitutional right against self-incrimination to the jury panel, and in doing so, expressed his personal opinion what he would do if charged with a crime: "I think I would probably want to get up and tell my side. It's just my nature. I would want to probably say my point of view on the thing or my version of the facts, but that's just me." 400 S.W.3d at 96. The defendant in *Unkart* did not lodge a contemporaneous objection to the statement but did raise the issue the next day in a motion for mistrial. *Id.* at 97–98. In his motion, the defendant clarified that he was not asking for an instruction to disregard the judge's comments. *Id.*

Although the Court did not condone this comment, it concluded that when read in context with the surrounding statements made by the trial judge, it did not constitute fundamental error. In particular, the Court found it significant that both before and after making the statement, the trial judge had explained to the jury panel that other individuals might have different views on whether they would prefer to take the stand to testify in a criminal

proceeding, and that a defendant in any given case might have "legitimate reasons" for not testifying, which could be unrelated to his guilt or innocence. *Id.* at 101–02. The Court also found it significant that, although the trial judge told the jury his personal preference to testify at trial, he never expressed an opinion on whether he believed that the defendant in that case or any defendant in general "ought to want to testify" at trial. *Id.* at 101.

The Court then contrasted the comments made by the trial judge in *Unkart* with the comments made by the trial judge in *Blue*, concluding that the comments made in *Blue* were a "far cry" from those under consideration in *Unkart*. *Id.* at 102. In reaching that conclusion, the Court made it clear that the comments it found objectionable in *Blue* were not the comments made by the trial judge regarding the defendant's right to remain silent or the example of the unscrupulous lawyer allowing his client to lie on the stand, but were instead the negative comments the judge expressed about the defendant and his participation in the plea bargain process. *Id.* at 102 (noting that although a "similar discussion occurred in *Blue* concerning a defendant's failure to testify, no such discussion occurred in connection with the trial judge's comments that the defendant was involved in plea negotiations and that the judge preferred that the defendant plead"). In distinguishing *Blue*, the Court found it significant that the trial judge in *Unkart* made no similar comments expressing a negative attitude to-

---

**10.** In their concurring opinions, two justices agreed that the trial judge had committed fundamental error by making these statements, adding their concern that the defendant was also deprived of his right to have an "impartial" tribunal decide his case. 41 S.W.3d at 134–35 (Mansfield, J. concurring); and at 136, 138 (Keasler, J. concurring). Justice Mansfield was the only member of the Court to express any concern about the "Sis-

ter Teresa" example given by the trial judge, finding that it impacted on the "presumption of innocence." *Id.* at 134–35 (Mansfield, J. concurring). However, the primary concern for Justice Mansfield, as with the other members of the Court, centered on the trial court's negative comments about the defendant and his desire for the defendant to enter into a plea bargain agreement with the State. *Id.* at 135.

ward the defendant, expressed no desire for the defendant to plead guilty, and did not disclose any information about plea bargain negotiations between the defendant and the State. *Id.*

Finally, the Court found it significant that during his comments to the jury panel, the trial judge in *Unkart* carefully and scrupulously emphasized the important nature of a defendant's constitutional right to remain silent, advising them that the law required them to not hold the defendant's failure to testify against him, and that in doing so they would be required to put aside their personal preferences on that subject. The Court concluded that when viewed in context, it was clear that in contrast to the negative comments made by the trial court in *Blue*, the trial judge's comments in *Unkart* were "made with the manifest intent to benefit the defendant and to protect his rights [and] ... were part of an extended effort to hammer home to the jurors that they should not hold a defendant's failure to testify against him." *Id.* at 96–97, 101. The Court therefore concluded that the challenged statement made by the trial court did not constitute fundamental error. *Id.* at 96. It further noted that even if some "residual harm" resulted from the judge's statement, it "would have been cured by a timely instruction to disregard the specific comments that appellant found objectionable." *Id.* at 102. Because the defendant made no such request, the Court concluded that he "forfeited a lesser remedy by failing to request an instruction to disregard." *Id.*

We find the present case is controlled by *Unkart* and not by *Blue*. Unlike the trial judge in *Blue*, the trial court in the present case made no statements expressing a negative attitude toward Appellant, made no mention that he had any desire for the defendant to plead guilty, and did not dis-

close any information regarding any plea bargain negotiations between Appellant and the State. Further, the example given by the trial court that Appellant complains about was in no way similar to the example given by the trial judge in *Blue*. As Justice Mansfield pointed out in his concurring opinion in *Blue*, the example given by the trial judge in *Blue* was of an attorney putting his admittedly guilty client on the stand, and allowing her provide perjured testimony in order to intentionally dupe the jury. As Justice Mansfield pointed out, this impacted the defendant's presumption of innocence, as it indicated to the jury that "defense lawyers have no scruples against putting on false testimony if it would benefit their clients[.]" *Blue*, 41 S.W.3d at 135 (Mansfield, J. concurring). No such concern exists in the present case, because here the trial court's example was of a defendant accused of speeding, who wishing to provide his own version of the facts to the court, testified honestly on the stand, thereby unwittingly leading to his conviction. Moreover, in the trial court's example, there was no lawyer involved, and no implication that the defendant (or his lawyer) was acting in an "unscrupulous" manner in order to obtain an acquittal.

We also disagree with Appellant's contention that the trial court's example sent a message to the jury that when defendants do not testify "it is because they are guilty and that what they have to say will not help them[ ]." When viewed in context, this was not the message the trial court imparted to the jury panel, nor do we believe the jury panel would have perceived it as such. To the contrary, as in *Unkart*, the trial court informed the jury panel that there "might be a lot of reasons" why a defendant might not want to testify, and expressly advised the panel that "[e]ven if you were a hundred percent innocent, it still might not be a good idea

[to testify at trial.]" *Cf. Unkart*, 400 S.W.3d at 101–02 (noting that the trial judge told the jury panel that there might be "legitimate reasons, unrelated to guilt, for not testifying"). And, more importantly, as in *Unkart*, the trial court began and ended his comments by emphasizing the importance of a defendant's constitutional right to remain silent and the presumption of innocence. Further, he cautioned the panel at least twice that they could not hold it against Appellant if he chose not to testify at trial, and expressly asked the jury if there was anyone on the panel "who would hold it against this defendant or any defendant if they elected not to testify in their own case?" Accordingly, as in *Unkart*, we conclude that the trial court made his comments with the "manifest intent to benefit the defendant and to protect his rights [and] were part of an extended effort to hammer home to the jurors that they should not hold a defendant's failure to testify against him." [11] *Cf. Unkart*, 400 S.W.3d at 101. Finally, we note that as in *Unkart*, any "residual harm" arising from the trial court's comments could have been cured by a timely instruction to disregard the example given by the trial court, but Appellant failed to request any such instruction. *Cf. Id.* at 102. Issue Four is overruled.

## CONCLUSION

The trial court's judgment is affirmed.

11. Appellant also contends, without explanation, that the trial court's remarks constituted an improper comment on the "weight of the evidence[.]" We note, however, that no evidence had been presented at the time the trial court made his comments, and that in any event, the court's comments did not indicate that he had any preconceived notion of what the evidence might show or that he had already formulated an opinion about the case. As such, we find this argument, to the extent it is adequately briefed, to be without merit.